2022 IL App (4th) 210409

NO. 4-21-0409

FILED
October 6, 2022
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| DEREK D. HAYES, | ) | No. 17CF635 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Raylene Grischow, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Justices Harris and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1        In February 2021, a jury found defendant, Derek D. Hayes, guilty of first degree

murder (720 ILCS 5/9-1(a)(1) (West 2016)), finding he personally discharged the firearm

resulting in the death of Sheena Malone, aggravated discharge of a firearm (720 ILCS 5/24-

1.2(a)(2) (West 2016)), and aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1),

(a)(3)(A-5) (West 2016)). The trial court sentenced defendant to an aggregate sentence of 55

years' imprisonment.

¶ 2        On appeal, defendant argues (1) he received ineffective assistance of counsel

where counsel pursued a theory of second degree murder by provocation at trial and (2) the trial

court erred in denying his requested jury instruction for second degree murder. We disagree and

affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On May 30, 2017, a vehicle stopped at the traffic light at the corner of 1st Street

and Ash Street in Springfield, Illinois. Attendees of a barbeque at the house of Sanatra Sullivan

heard sounds like fireworks, and witnesses saw a man leaning out the window of the vehicle with

a gun in hand. A bullet struck and killed Malone.

¶ 5        A grand jury indicted defendant with one count of felony murder (720 ILCS 5/9-

1(a)(3) (West 2016)) (count I), two counts of aggravated discharge of a firearm (720 ILCS 5/24-

1.2(a)(2) (West 2016)) (counts II and III), and one count of aggravated unlawful use of a weapon

(720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2016)) (count IV).

¶ 6                            A. Pretrial Motions

¶ 7        In March 2019, the State filed a motion to add two additional charges of first

degree murder, adding alternative theories of first degree murder. After a hearing, the court

allowed the State to add the two additional counts of first degree murder under the intentional

murder theory (720 ILCS 5/9-1(a)(1) (West 2016)) (count V) and the knowing murder theory

(720 ILCS 5/9-1(a)(2) (West 2016)) (count VI). The State subsequently presented the charges to

a grand jury, who returned true bills of indictment on the two additional charges of first degree

murder.

¶ 8        In January 2020, defendant filed a motion *in limine* to present evidence of

collateral crimes. According to defendant, on August 25, 2016, defendant was in the Handy

Pantry located at Spring Street and Cook Street. He exited the store with a bottle of liquor and

noticed his car and brother were missing. An unknown individual struck defendant in the head

with a gun. Defendant received treatment for a laceration to his head as a result of the attack,

which left a scar. Police did not apprehend anyone in relation to the assault. The State offered no

objection, and the trial court allowed defendant's motion *in limine*. Subsequently, during a final

pretrial hearing in February 2021, the State inquired about any defense intent to submit lesser included or lesser mitigated offense instructions—like second degree murder. Defense counsel refused to say, arguing "trials are dynamic" and noting the distinction between required disclosure of affirmative defenses and the possible tendering of lesser included offenses that might become relevant as the trial progressed.

¶ 9    In November 2020, the State and defendant filed a joint motion to dismiss count I, which the trial court granted.

¶ 10    On February 16, 2021, the State filed an amended exhibit list, listing the exhibits it intended to admit during trial. Included in the list was the "Recorded Interview of Defendant." They previously filed additional discovery on February 11, listing "One CD Hayes Interview Exhibit; Transcript—Consecutively numbered pages 1-42."

¶ 11                      B. Jury Trial

¶ 12    On February 22, 2021, defendant's jury trial began. During opening arguments, defense counsel laid out the case as follows:

> "Now, ladies and gentlemen, you might be taken aback to hear this from me, [defendant's] advocate, but [defendant] did in fact shoot and kill Sheena Malone just as the State just told you they would prove. This trial is not some kind of whodunit. We're not going to ask you to solve a crime."

Counsel informed the jury its role was to "explain to you why [defendant] did just that." Counsel named Mylas Donald as defendant's intended target and acknowledged defendant's accidental shooting of Malone did not absolve him of criminal wrongdoing. Instead, counsel explained, "the reason [defendant] shot and killed Ms. Malone is as equally important as the evidence that's going to be presented to you that he's the one that did it."

¶ 13                                    1. *State's Case*

¶ 14          Sullivan lived at 1940 South 1st Street and was hosting a barbeque the day of the

incident to celebrate the birth of her granddaughter. Donald, Sullivan's brother, was present with

his girlfriend, Malone. Sullivan heard a noise which "at first sounded like fireworks, but then it

kept happening." She looked up and "saw a guy shooting at [them]." Sullivan saw the gunman

"[h]anging out" of the front passenger window of a vehicle stopped at the stoplight. She did not

get a good look at the gunman but described him as a "younger" "dark-skinned" black male with

a lower haircut.

¶ 15          Cassandra Rechner attended the barbeque at 1940 South 1st Street. Rechner heard

a loud bang, and Sullivan pushed Rechner and her child out of the way. Rechner testified she

saw a man holding a gun "hanging" out of the window of an older vehicle, but she did not see

the gunman's face.

¶ 16          Dashayaa Jones, Sullivan's daughter, was also living at 1940 South 1st Street.

According to Jones, "a car rolled past" the house and "was sitting at the light" at the corner of 1st

Street and Ash Street, when "they just started shooting." Jones described the vehicle as burgundy

or a "purple red." The car was older with tinted windows and had black leather bra (a type of

covering over the nose of a vehicle) on the front. She believed an acquaintance's sister owned a

similar car. Jones saw the gunman leaning out of the window of the vehicle. She described him

as "a dark male with a low fade," meaning "a black male and had a short haircut." The gunman

was skinny, and Jones estimated him being between 20 and 25 years old.

¶ 17          Brittney Splain, a neighbor of Sullivan's, heard gunshots and then witnessed a car

"speeding through a stop sign." She described the car as "an older model, shade of purple, four-

door car."

¶ 18        Kevin Cash, a dispatcher in Sangamon County, received a 911 call related to the incident. The State played a recording of the call for the jury.

¶ 19        Jacob Ward, a police officer with the Springfield Police Department, responded to a call about shots being fired. Ward arrived at 1940 South 1st Street, where a large group of people surrounded Malone. Ward rendered aid until paramedics arrived and transported Malone to the hospital. Once paramedics removed Malone from the scene, Ward attempted to speak with witnesses. A recording of Ward's body-worn camera footage was played for the jury. On cross-examination, Ward stated he attempted to speak to Donald but "[h]e was very emotional and angry, upset, and [Ward] was unable to speak with him clearly." Donald was uncooperative and threatened Ward.

¶ 20        Police officers collected video surveillance from a nearby businesses that showed the suspect vehicle. The surveillance videos were played for the jury.

¶ 21        Springfield police officer Robert Fleck testified how several days before the shooting, he conducted a traffic stop on a "purplish, four-door sedan" with a black vinyl car bra on the front. The driver of the car was Yvette Bustamante.

¶ 22                            2. *Redactions*

¶ 23        Before the jury was brought in on the second day of defendant's trial, defense counsel brought to the court's attention the State's intent to redact two items from the recording and transcript of defendant's interview with police—namely, two statements from police officers during the interrogation that implied defendant was justified in shooting at Donald and that defendant had no intention to shoot the girl. Defense counsel argued the State should not be permitted to redact the statements and must play the interview in full. The State contended it was presenting the interview to the jury because although he initially denied involvement, defendant

ultimately confessed to the shooting during the course of the interrogation, explaining it was the result of being robbed nine months before. The State further argued defendant would have to introduce the statements supporting his theory of the case during his own case-in-chief, noting how defendant's theory of defense acknowledged "he did commit the murder and this is why." During the arguments of counsel, both sides acknowledged the defense theory was that the shooting was "somehow justified or reasonable." After further argument, the court took the matter under advisement.

¶ 24                                  3. *State's Case Continued*

¶ 25        The parties stipulated a 1995 Chevrolet Lumina was registered to Bustamante. Bustamante then took the stand.

¶ 26        Bustamante testified she owned a 1995 Chevrolet Lumina, which was "grayish" in color, had tinted windows at one point, and had a car bra on the front. A few days before the shooting, she received a traffic ticket for running a red light while driving the Lumina. Around the time of the shooting, Bustamante and defendant were "messing around" and in a "romantic involvement."

¶ 27        Bustamante received a call from defendant and went to pick defendant and his brother up. Defendant seemed "[r]egular" and not "particularly emotional." Defendant sat in the front passenger seat, and his brother sat in the back seat. She took the pair to defendant's mom's house, and defendant went inside the house for a few minutes, then returned. She did not see defendant carrying anything. Defendant's brother directed Bustamante where to drive until they arrived at the stoplight at the corner of 1st Street and Ash Street. Bustamante stopped at the red light, at which point she noticed defendant rolling down his window. She started to ask him why since she had the air conditioning on when defendant "just started shooting." Defendant was

- 6 -

leaning out of the car and fired about six shots. Bustamante was in shock and "didn't know what was going on." She "snapped out of it" after defendant's brother told her to go, and she drove off. After the shooting, defendant took the tint and car bra off Bustamante's car, then they drove the car to Missouri.

¶ 28 When Bustamante arrived at court for her traffic violation, detectives asked to speak to her about the Lumina. Initially, Bustamante lied and told them her transmission was broken, but she eventually talked to detectives about the shooting. Bustamante retrieved the Lumina. Before police collected the Lumina, defendant attempted to disable the car so it would not start, cleaned it out, and washed it. Bustamante also agreed to assist in the investigation and wear a listening device around defendant.

¶ 29 After Bustamante's testimony, the court denied the State's request to redact the police officers' statements and ruled the defendant's interview should be played in its entirety if the State intended to play it.

¶ 30 Detective Donald Edwards administered photo lineups to Sullivan and Jones. Sullivan did not make any identification from the photo lineups. Jones thought two of the subjects looked like the gunman but could not make a positive identification.

¶ 31 Detective Michael Mazrim of the Springfield Police Department investigated the shooting. Through interviews and security camera footage, he was able to identify the suspect vehicle as a 1995 Chevrolet Lumina registered to Bustamante. After speaking with Bustamante, Mazrim obtained a warrant for the overhear, set up the covert recording device with Bustamante, and helped her with a cover story to not arouse suspicion for her cooperation. The recordings of the resulting conversations were played for the jury, and the jury was provided with a transcript. At one point during the conversations, Bustamante stated, "It probably wouldn't even be this bad

if you would've shot dude and not her, right?" Defendant responded, "I know this, Yvette." When talking about how they were going to clean the inside and outside of the car, presumably to remove any evidence of gunshot residue, defendant mentioned how "I was out the window when I did the s***."

¶ 32    The State rested without entering defendant's police interview into evidence.

¶ 33                                  4. *Defendant's Case*

¶ 34    Defendant moved for a directed verdict, which the trial court denied.

¶ 35    Defendant, after receiving admonishments, chose to testify. He testified about the August 25, 2016, incident nine months before the shooting. He recounted how he and his brother went to the Handy Pantry at Cook and Spring Streets in Springfield. Defendant went inside while his brother waited in the car. When defendant came out of the Handy Pantry with a bottle of liquor, he noticed the car and his brother were gone. At this point, an unknown individual struck defendant in the head with a gun. He fell to the ground and dropped the bottle he was carrying. Defendant got up to "charge" the assailant but found the assailant pointing the gun at him. Defendant fled. He received treatment at the hospital for the wound on his head, which left a scar. Defendant filed a police report, but to his knowledge, the crime was never solved.

¶ 36    On May 30, 2017, defendant received a call "stating that the guy that robbed me was down the street from me." Defendant rode with Bustamante to his mom's house, where he retrieved a gun. Defendant was only planning to confront the person but brought the gun because he assumed the person who assaulted him would also be armed. When Bustamante stopped at a red light, defendant, who was riding in the front passenger seat, saw the man he believed had assaulted him. In defendant's words, "[O]nce I seen the guy, my emotions just took over, and I intended on trying to kill him." Defendant began firing his gun. He never intended to hit Malone

and "felt terrible" when he learned she died. Defendant helped conceal Bustamante's car because he was scared of being arrested. On cross-examination, defendant confirmed he did not know the person he believed assaulted him was Donald at the time of the shooting but had learned Donald's name since the incident.

¶ 37        Springfield police officer Michael Brown testified he investigated the Handy Pantry assault. After defendant's report, Brown reviewed surveillance video from Handy Pantry and confirmed defendant was struck by an unknown assailant with an object that appeared to be a handgun. Defendant had a visible injury on his head from the assault. Brown stated no one was ever arrested in connection with the assault and the crime was never solved.

¶ 38                    5. *Jury Instructions and Closing Argument*

¶ 39        Defense counsel moved for a jury instruction on second degree murder based on provocation. In summary, defense counsel acknowledged the time between the armed robbery and the shooting was longer than normally seen in cases of provocation but argued that seeing the person who robbed and beat him on the day of the shooting "rekindled the defendant's passion" and was such that it was sufficient to "trigger the passion of a reasonable man" quoting from Wayne LaFave's treatise on substantive criminal law (see 2 Wayne R. LaFave, Substantive Criminal Law § 15.2(d) (3d ed. 2021)). As a result, defendant's "emotion took over and he tried to kill him," thereby justifying a second degree murder instruction. The State maintained the disproportionate nature of defendant's retaliation to the initial provocation removed his conduct from any consideration of a second degree murder instruction. They also argued the delay between the provocation and the shooting was too long, and there was no clear evidence defendant could even identify the person who originally struck him as the person he was shooting at on the day in question. After extensive argument from both parties, the court

concluded it did not "believe the evidence supports the giving of a second-degree murder instruction" and denied the jury instruction.

¶ 40 In closing argument, defense counsel reiterated defendant did in fact shoot and kill Malone, but defendant chose to testify at his trial because "[h]e wanted [the jury] to know why he killed Sheena Malone."

¶ 41 The jury found defendant guilty of first degree murder, including a finding defendant personally discharged a firearm that caused death to another person, aggravated unlawful use of a weapon, and aggravated discharge of a firearm.

¶ 42 C. Posttrial Motions and Sentencing

¶ 43 Defendant filed a motion for a new trial, arguing, in part, the trial court erred when it denied defendant's motion to instruct the jury on second degree murder on a theory of provocation. The court denied defendant's motion.

¶ 44 The trial court determined defendant's other convictions merged into his first degree murder conviction. For first degree murder, the court sentenced defendant to 30 years in prison with a firearm enhancement of 25 years, for an aggregate term of 55 years' imprisonment.

¶ 45 This appeal followed.

¶ 46 II. ANALYSIS

¶ 47 On appeal, defendant argues (1) he received ineffective assistance of counsel where counsel pursued a theory of second degree murder by provocation at trial and (2) the trial court erred in denying his requested jury instruction for second degree murder. As an aside, we note a defendant may have the right to argue inconsistent defenses at trial. See *People v. Wheeler*, 200 Ill. App. 3d 301, 558 N.E.2d 758 (1990). It seems a less tenable pursuit on appeal. Defendant argues vociferously on the one hand counsel was ineffective for asserting second

degree provocation, contending it was "patently untenable and doomed to fail" and "given the caselaw and established authority, the judge was never going to grant the requested provocation instructions" because "no law supported giving such instructions." Then, in the next breath, defendant maintains the trial court committed not just error, but reversible error by refusing to give the provocation instruction for which he had just contended there was no basis in "caselaw and established authority"—meaning everything he just argued was not true and indeed there was sufficient evidence and support in the law for the giving of such an instruction and it was error for the court not to do so. Regardless, we take each argument in order.

¶ 48                        A. Ineffective Assistance of Counsel

¶ 49        Defendant alleges defense counsel was ineffective for presenting a defense of second degree murder under a theory of provocation, as defendant's situation does not meet the legal definition of provocation. Defendant contends, therefore, counsel pursued an invalid defense that not only proved defendant's guilt, "but did so at the expense of a valid and plausible defense—challenging [defendant's] identity as the shooter." Defendant's claim on appeal ignores the record evidence of an extensive and aggressive defense mounted on his behalf by trial counsel. It also ignores the dynamics of the trial as it progressed. Prior to trial, defendant's counsel was confronted with the fact his client confessed to shooting at Donald who he believed to be the person responsible for robbing and hitting him with a gun at the Handy Pantry nine months before. The State previously tendered defendant's interview and a transcript of the interview in discovery and expressed their intention to use them in evidence at trial. Defendant knew Detective Mazrim told the grand jury defendant admitted firing several shots in the direction of the man who robbed him earlier. When defendant sought to have the incident at the Handy Pantry ruled admissible at trial, the State did not oppose the request, noting their intention

- 11 -

to introduce it as well. Defendant was also aware Bustamante would be testifying about driving him to the location, seeing him shoot from the passenger side window of the car, and the conversations later when trying to hide or destroy evidence. Defendant's choice of defense strategy must be considered in light this evidence.

¶ 50                                          1. *Standard of Review*

¶ 51          A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29, 89 N.E.3d 366. To prevail on such a claim, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). To establish deficient performance, the defendant must show "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14, 67 N.E.3d 233 (quoting *Strickland*, 466 U.S. at 688). Prejudice is established when a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004) (citing *Strickland*, 466 U.S. at 694). A defendant must satisfy both prongs of the *Strickland* standard, and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d 302, 317-18, 939 N.E.2d 310, 319 (2010).

¶ 52          " 'Effective assistance of counsel refers to competent, not perfect representation.' " *Evans*, 209 Ill. 2d at 220 (quoting *People v. Stewart*, 104 Ill. 2d 463, 491-92, 473 N.E.2d 1227, 1240 (1984)). "Mistakes in trial strategy or tactics do not necessarily render counsel's representation defective." *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 10, 93 N.E.3d 664. "The decision to rely on one theory of defense to the exclusion of other theories of

defense is a matter of trial strategy." *People v. Clark*, 207 Ill. App. 3d 439, 450, 565 N.E.2d 1373, 1380 (1991). The Illinois Supreme Court wrote, "We have also made it clear that a reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344, 864 N.E.2d 196, 216 (2007). "[I]n order to establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. [Citations.] Matters of trial strategy are generally immune from claims of ineffective assistance of counsel." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327, 948 N.E.2d 542, 547 (2011). " 'Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found.' " *People v. Peterson*, 2017 IL 120331, ¶ 80 (quoting *Perry*, 224 Ill. 2d at 355-56). However, a counsel's failure to understand the law can constitute deficient performance. See, *e.g.*, *People v. Patterson*, 192 Ill. 2d 93, 121, 735 N.E.2d 616, 633 (2000).

¶ 53                                    2. *Second Degree Murder by Provocation*

¶ 54            We review the standard for finding a defendant guilty of second degree murder by provocation to explain counsel's attempted trial strategy.

¶ 55            A person is guilty of second degree murder when he commits the offense of first degree murder and at the time of killing he (1) is acting under a sudden and intense passion resulting from serious provocation by the individual killed or (2) he believes the circumstances justify using self-defense, but his belief is unreasonable. *People v. Blackwell*, 171 Ill. 2d 338, 357, 665 N.E.2d 782, 790 (1996). Trial counsel presented a theory based on the former.

¶ 56 Serious provocation is defined as "conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9-2(b) (West 2016). The categories of provocation courts have recognized as sufficient to warrant a second degree murder instruction based on serious provocation are (1) mutual quarrel or combat, (2) substantial physical injury or assault, (3) illegal arrest, and (4) adultery with the offender's spouse. *People v. Page*, 193 Ill. 2d 120, 133, 737 N.E.2d 264, 272 (2000). However, serious provocation will only constitute a mitigating factor if the killing occurs before the defendant has had enough time for tempers to cool. *People v. McDonald*, 63 Ill. App. 2d 475, 479, 212 N.E.2d 299, 301 (1965). Whether a sufficient cooling off period existed depends upon the magnitude of the provoking act and the degree to which passions have been aroused in the defendant. *People v. Hudson*, 71 Ill. App. 3d 504, 511, 390 N.E.2d 5, 10 (1979). " '[N]o yardstick of time can be used by the court to measure a reasonable period of passion but it must vary as do the facts of every case.' " *People v. Yarbrough*, 269 Ill. App. 3d 96, 101, 645 N.E.2d 423, 426 (1994) (quoting *People v. Harris*, 8 Ill. 2d 431, 435, 134 N.E.2d 315, 317 (1956)).

¶ 57 In light of the evidence confronting defendant at trial, counsel's strategy was to convince the jury the assault nine months before, involving the threat with a gun, which resulted in substantial physical injury to defendant, was serious provocation. On the date of the shooting, being informed of the location of the person who robbed and pistol-whipped him nine months before—a person who had not yet been apprehended for the crime—defendant's observation of the person who had done this to him was sufficient provocation for defendant to act under sudden and intense passion and begin shooting at him. Under counsel's theory, seeing his assailant caused defendant to experience flashbacks to his assault, thereby causing an incident from nine months before to result in a sudden and intense passion that led to the shooting.

- 14 -

¶ 58                                    3. *This Case*

¶ 59                                    a. Prejudice

¶ 60            Here, defendant's claim of ineffective assistance of counsel fails because he clearly was not prejudiced by trial counsel's defense strategy. The evidence against defendant in this case was overwhelming. Despite defendant's argument identity would have been at issue without his admission, the State's other evidence definitively showed defendant was the shooter. There was no doubt the vehicle the gunman shot from was Bustamante's Lumina. Bustamante's identification of defendant as the gunman was corroborated by the conversation from the overhear recording. Defendant attempted to hide or destroy evidence by altering the appearance of Bustamante's Lumina so it was less recognizable and to disable the vehicle from functioning. Bustamante received a call from defendant's cell phone matching her description of events. Although the witness descriptions of the shooter were general, they still matched defendant's appearance the day of the shooting, further corroborating Bustamante's testimony. In the face of the overwhelming evidence of his guilt, defendant cannot demonstrate a reasonable probability the results of the proceeding would have been different had counsel not pursued the strategy of a lesser-mitigating offense. See *Evans*, 209 Ill. 2d at 219-20.

¶ 61                                    b. Deficient Performance

¶ 62            Moreover, even if defendant could establish prejudice, we further find counsel's choice to pursue a second degree murder mitigation strategy was not objectively unreasonable. We must judge the reasonableness of counsel's performance within the context of the facts and circumstances of the case. *Strickland*, 466 U.S. at 690.

¶ 63            The context of the defendant's case as they began trial was one where defendant had no reasonable defense. Prior to trial, the State disclosed in an amended exhibit list they

- 15 -

intended to admit defendant's recorded interview after his arrest, as well as a transcript of the interview. From defendant's motion *in limine* to present evidence of collateral crimes, counsel explained during defendant's interview, "Defendant is alleged to have confided with the detectives that he pulled out his gun and started shooting in the direction of Donald." Defense counsel began trial under the impression the State fully intended to introduce into evidence an alleged confession. It was not until the third day of defendant's trial, after the trial court's ruling the State could not redact selected statements of police officers in the recording, it became clear the State was not going to introduce the interview.

¶ 64        "A weak or insufficient defense does not indicate ineffectiveness of counsel in a case where a defendant has no defense." *People v. Ganus*, 148 Ill. 2d 466, 474, 594 N.E.2d 211, 215 (1992). In this case, counsel had to approach trial with the understanding defendant's identity would not be at issue. Defendant's only defense, therefore, was a vain attempt to sway the sympathy of the jury based on his earlier assault and hope for a lesser-mitigating conviction. Counsel thoroughly pursuing the only path available to defendant is not ineffective assistance of counsel. See *Peterson*, 2017 IL 120331, ¶ 80.

¶ 65        Further, when evaluating a claim of ineffective assistance, we must consider "the 'totality of counsel's conduct.' " *People v. Winkfield*, 2015 IL App (1st) 130205, ¶ 24, 41 N.E.2d 641 (quoting *People v. Spann*, 332 Ill. App. 3d 425, 430, 773 N.E.2d 59, 54 (2002)). Here, trial counsel provided extensive factual support for the theory of second degree murder. Counsel presented a detailed telling of the August 25, 2016, assault. Counsel examined defendant thoroughly on the details of the assault, his intent when he learned Donald was nearby the day of the shooting, and the emotions he felt when he saw Donald. In addition, counsel objected when he learned the State planned to redact statements by police from defendant's interview which

supported the theory defendant was overcome with emotion when shooting at Donald. Viewing counsel's performance in its entirety and in the context of the facts and circumstances of the case, we find he rendered the reasonably effective assistance to which defendant was entitled.

¶ 66                                        B. Jury Instructions

¶ 67            "A defendant is entitled to a[ ] [jury] instruction on his theory of the case if there is some foundation for the instruction in the evidence." *People v. Jones*, 175 Ill. 2d 126, 131-32, 676 N.E.2d 646, 649 (1997). Defense counsel may tender a proposed jury instruction on its theory of the case, and the trial court should give the instruction, even if "[v]ery slight evidence" supports giving the instruction. *Jones*, 175 Ill. 2d at 132. When deciding whether to give a tendered instruction, " 'the court's role is to determine whether there is some evidence supporting that theory,' " without weighing the evidence. *Jones*, 175 Ill. 2d at 132 (quoting *People v. Jones*, 276 Ill. App. 3d 1006, 1012, 659 N.E.2d 415, 420 (1995) (Cook, P.J., dissenting)). On appeal, the trial court's decision to deny a defendant's request for a certain jury instruction is reviewed under the abuse-of-discretion standard. *People v. McDonald*, 2016 IL 118882, ¶ 42, 77 N.E.3d 26. An abuse of discretion will be found "where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *McDonald*, 2016 IL 118882, ¶ 32.

¶ 68            Here, defendant was charged with first degree murder, and he requested the trial court to instruct the jury on the lesser-mitigating offense of second degree murder. First degree murder occurs when an individual "either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or *** he [or she] knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(1), (2) (West 2016). We discussed above the

standard for second degree murder by provocation. See *supra* ¶¶ 54-56. A defendant can be found guilty of second degree murder only if the State first proves all elements of first degree murder. *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 39, 89 N.E.3d 854. The defendant then has the burden of proving a mitigating factor by the preponderance of the evidence. *Neasom*, 2017 IL App (1st) 143875, ¶ 39.

¶ 69 Defendant contends Donald's alleged assault of defendant nine months prior provided the necessary basis for provocation. According to defendant, he did not plan on killing Donald, but when defendant saw who he believed was his assailant, "emotions took over." This, according to defendant, demonstrated he was overcome by an intense passion. See 720 ILCS 5/9-2(b) (West 2016).

¶ 70 Although defendant points out " '[n]o yardstick of time can be used by the court to measure a reasonable period of passion but it must vary as do the facts of every case' " (*Yarbrough*, 269 Ill. App. 3d at 101 (quoting *Harris*, 8 Ill. 2d at 435)), no Illinois authority supports a period of nine months as insufficient for a cooling of passions. See *Hudson*, 71 Ill. App. 3d at 511 (five-minute lull in fight insufficient cooling off period); *Harris*, 8 Ill. 2d at 435 (15 minutes after the defendant was seriously injured insufficient cooling off period); *People v. Jarvis*, 158 Ill. App. 3d 415, 429, 511 N.E.2d 813, 822 (1987) (3½ hours after mutual fight sufficient cooling period); *Yarborough*, 269 Ill. App. 3d at 101 (period of time wherein defendant learned of incident, drove to victim's location, walked to victim's residence, returned to his brother's apartment to retrieve a firearm, walked back to victim's residence, observed the victim smile, and shot the victim as he attempted to flee was sufficient to cool passions).

¶ 71 Provocation requires a defendant be acting under a "sudden and intense passion *** which *resulted* from serious provocation." (Emphasis added.) *Yarbrough*, 269 Ill. App. 3d at

101. Defendant's own testimony demonstrated he was not in a state of intense passion for nine months, as he testified he only intended to confront Donald. Counsel's argument, although perhaps not well supported in caselaw, was a refinement of known and existing law on provocation. It was not the incident from nine months before that caused the sudden and intense passion but the observation of his assailant, and the passion that engendered, that caused him to begin shooting. As a result, the precipitating incident, under defendant's theory immediately preceded the shooting, with no "cooling off" period was well within the timeframes of the cases cited above. Unfortunately, even if his mental state at the time of the shooting could be described as a "sudden and intense passion" from remembering the assault, this state would not be the "provoking act" otherwise required. See *Yarbrough*, 269 Ill. App. 3d at 101 (citing *Hudson*, 71 Ill. App. 3d at 511; *Harris*, 8 Ill. 2d at 435).

¶ 72     There was not even "slight" evidence defendant was in a state of sudden and intense passion as a result of Donald's provocation, and therefore, there was not even "slight" evidence supporting a second degree murder instruction.

¶ 73     As there was no evidence to support a second degree murder instruction, we find the trial court did not abuse its discretion in refusing to tender such an instruction to the jury.

¶ 74                               III. CONCLUSION

¶ 75     For the reasons stated, we affirm the trial court's judgment.

¶ 76     Affirmed.

*People v. Hayes*, 2022 IL App (4th) 210409

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Sangamon County, No. 17-CF-635; the Hon. Raylene Grischow, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Jennifer L. Bontrager, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Daniel K. Wright, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Linda S. McClain, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |