NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 240277-U

NO. 4-24-0277

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 18, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Warren County |
| NICHOLAS WAYNE LINK, | ) | No. 23CF10 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Nigel D. Graham, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Lannerd and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed defendant's conviction for possession of a stolen motor vehicle after concluding that defendant's trial counsel was not ineffective for failing to request that the jury be instructed on the affirmative defense of necessity. Because there was insufficient evidence that defendant reasonably believed that his conduct was necessary to avoid injury, defendant would not have been entitled to the instruction had counsel requested it, and thus, counsel did not perform deficiently. Additionally, defendant failed to establish prejudice because he failed to show that the result of the proceeding would have been different absent counsel's purported error.

¶ 2    Following a jury trial, defendant, Nicholas Wayne Link, was convicted of possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2022)). The trial court sentenced defendant to three years in prison. Defendant appeals, arguing that his trial counsel was ineffective for failing to request that the jury be instructed as to the affirmative defense of necessity. We affirm.

¶ 3                                 I. BACKGROUND

¶ 4          On January 20, 2023, defendant was charged with the aforementioned offense and the additional offenses of burglary (720 ILCS 5/19-1(a) (West 2022)) and theft (720 ILCS 5/16-1(a)(1) (West 2022)) as a result of his involvement in taking Todd Miller's 2015 Polaris Ranger utility terrain vehicle (UTV) from Miller's property on January 3, 2023. The State ultimately dismissed the burglary charge, and the case proceeded to trial on October 16, 2023.

¶ 5          The following evidence was adduced at trial. Todd Miller testified that he owned a farm west of Kirkwood, Illinois. He owned a gray UTV with a "tilt bed" that was stored inside a shed on his farm. He always kept the shed doors shut and locked. Miller explained that on January 3, 2023, a neighbor called him to ask if he knew that the doors to his shed were open. He went to the shed and discovered that his UTV was gone. Miller acknowledged that he left the key in the UTV. He filed a theft report with the Warren County Sheriff's Office, and a deputy responded and took photographs of the scene. That evening, Miller made a Facebook post offering a reward for any information regarding who may have taken the UTV. The following afternoon, Miller received a phone call from an individual who believed the UTV was in a yard at a residence in Gladstone, Illinois. Miller called the Henderson County Sheriff's Office and asked to check if the UTV could be identified. Miller later received a call confirming that the UTV was his, as the vehicle identification number on the UTV matched the one Miller gave in his theft report. Miller went to the residence to retrieve the UTV. Because the key was missing, he had to push the UTV onto the trailer he brought with him, then he returned it to his residence.

¶ 6          Thereafter, the sheriff's office informed Miller that defendant was identified as a suspect. Miller testified that he knew defendant but that defendant never had permission to go into his shed or use his UTV. Following defendant's arrest, defendant called Miller from jail. He told

Miller that he went to the farm with others on the night of the theft but told them "not to do anything" and not to "take anything." Defendant also told Miller that the UTV was first taken to his mother's home before it was moved to where the UTV was ultimately located. Defendant stated that his mother was supposed to call Miller and tell him where the UTV was, but Miller testified that he received no such phone call. Defendant asked Miller "to contact the state's attorney to see about having the charges dropped" and to "bond him out," but Miller declined.

¶ 7 Robert Boughton testified that he spoke with the Henderson County Sheriff's Office about seeing "a couple people" dropping off a UTV on the east side of Tim Stangland's residence, which was next door to his home. Boughton did not know these individuals, but "a male was driving and *** [a] female was in the passenger seat." Later, when the police visited his neighbor to ask about the UTV, Boughton heard his neighbor say that he did not know anything about it being dropped off at his house. Boughton told the officer that his neighbor was "lying" because he observed the individuals go into the neighbor's house before they all came back outside to look over the UTV. Boughton testified that after the UTV was parked next door, a gray Dodge arrived. According to Boughton, "a couple guys" exited the Dodge, picked up the male and female, and then "took off." The UTV was left behind.

¶ 8 Deputy Dillon Tee of the Warren County Sheriff's Office testified that he was dispatched to speak with Miller regarding the UTV theft. Miller told Tee that he last saw the UTV at 4 p.m. on January 1, 2023. After speaking with Miller, Tee examined the shed. The door was open, and there appeared to be pry marks on it. There were no obvious fingerprints or shoeprints, and Tee located no physical or forensic evidence at the scene.

¶ 9 Deputy Ronald Russell of the Henderson County Sheriff's Office testified that he was advised of a possible stolen vehicle at a residence previously owned by Billy Miller in

Gladstone. When Russell drove by the residence, he observed a vehicle matching the description of the missing UTV. Russell stopped at the house, and Stangland walked out of the basement. Stangland explained that he had just purchased the home. When Russell asked about the UTV, Stangland became "evasive" and said he did not know why it was there or who left it there. Boughton, who lived next door, was standing a few feet away and got Russell's attention. Russell's testimony was consistent with Boughton's in that he explained that when Russell approached, Boughton told him that he saw two people drop off the UTV the day before. One person was a blonde female carrying a white bag, and the other was a bearded man. According to Boughton, they drove up to the house and went inside. Stangland then came outside and looked at the UTV before they left. Russell again spoke with Stangland, who stated that the UTV appeared "about the time" Missy Palazzo and defendant "showed up the day before." After locating the serial number on the UTV, Miller was contacted and permitted to pick it up, though the key to the UTV was still missing. Russell testified that, later, Boughton identified Palazzo in a lineup. Boughton was unable to identify the male he saw in another lineup that included defendant.

¶ 10    Russell testified that on January 11, 2023, he and Police Chief Tim Edwards of the Oquawka Police Department interviewed defendant at the Henderson County Sheriff's Office. After reading defendant his rights, defendant agreed to speak with Russell. According to Russell, defendant acknowledged that at about 12:30 a.m. on January 3, he drove Billy Blakely and Trevor Pierce in Pierce's Lincoln to Miller's property. Defendant joined them because they said they needed a driver. Russell noted that defendant's "story" was that he did not learn they were going to Miller's property until just before they arrived, and defendant had told them "that they shouldn't do it." Upon arriving at Miller's property, they located the UTV in a shed and took it. Blakely and Pierce drove the UTV to defendant's parents' home in Gladstone while defendant followed in the

Lincoln. They left the UTV at defendant's parents' home, then drove to Oquawka. Defendant relayed that the next day, he, Blakely, Pierce, and Palazzo drove back to his parents' home, then he and Palazzo took the UTV to Stangland's home and left it there.

¶ 11 A recording of the interview was entered into evidence and played for the jury. During the interview, defendant claimed that he was in the Lincoln with Blakely and Pierce but did not initially know what they were doing. When Blakely told defendant that they intended to take the UTV from Miller's property, defendant told them not to do so, but they would not listen. Defendant said that he suggested that they take the UTV to his parents' home because if it was there, he could contact Miller to return it and prevent Blakely and Pierce from driving it somewhere where it could not be recovered. Pierce and Blakely drove the UTV to defendant's parents' home while defendant followed in the Lincoln. When they arrived, defendant's parents were outside, checking on the noise being made. After dropping off the UTV, defendant, Blakely, and Pierce drove back to Oquawka. The next day, Pierce picked up defendant, Blakely, and Palazzo in a truck. They went to defendant's parents' home to retrieve the UTV. Defendant acknowledged that he drove the UTV to Stangland's home. He stated that he believed Stangland was purchasing the UTV from Blakely and Palazzo. According to defendant, his father later showed him a Facebook post by Miller asking for information about the missing UTV and offering a $500 reward. As a result, defendant told Stangland that he needed to return the UTV to Miller, referencing the reward. Defendant noted that he thought Blakely and Pierce's original plan was to sell the UTV for drugs.

¶ 12 Russell testified that defendant showed him text messages he sent to Stangland, which were entered into evidence. They read, "we should take it back to the owner," "$500," and "reward." Russell testified that he also spoke with Palazzo, who told him that after dropping off the UTV at Stangland's home, she left with two individuals in a Dodge pickup truck. Palazzo was

"evasive" as to whether defendant was with them when they left. Russell noted that during the interview with Palazzo, he mentioned that he would "like to have those keys [to the UTV] back." Approximately one hour after that interview, the keys were located on the front steps of the sheriff's office.

¶ 13        Edwards testified that he learned that defendant had posted a video to Facebook, in which defendant made several statements relating to the UTV theft. Edwards was able to find the videos on defendant's Facebook page, and they were admitted into evidence and played for the jury. In the video, defendant stated that he had "no idea" of the plans to steal the UTV. He claimed that he did not learn about the plans until just prior to arriving at Miller's property. According to defendant, he told Blakely and Pierce to let him out of the car because he did "not want to be involved," but they continued traveling to Miller's property. Defendant stated that he had no choice. Additionally, Pierce "had a gun on him," and defendant was aware of "his background." Defendant stated that after the UTV was taken from the shed, a truck was supposed to pick it up, but it never arrived. Defendant noted that he decided to "intervene" to ensure that Miller could get his UTV back, so he suggested that they take it to his parents' residence. Defendant acknowledged that he parked the UTV once they arrived at his parents' residence, at which point defendant's parents came outside. Defendant claimed that, had they not come outside, he intended to tell his mother to contact Miller to have him pick up the UTV. However, defendant did not want his mother to be seen by Blakely and Pierce, given Pierce's "background" and what he was "capable of."

¶ 14        Defendant testified in his own defense. He asserted that on the evening of January 2 and early morning of January 3, 2023, he, Pierce, Blakely, and Palazzo were together in defendant's garage. Defendant heard the others mention a "side-by-side," and one of them told

him that Pierce and Blakely were leaving to go to Monmouth, Illinois. Defendant told them he would ride with them so that he could go to another friend's residence in Monmouth. During the drive, defendant sat in the back seat. Pierce was driving. About a mile away "from where [they] ended up going," Blakely told defendant, that they were " 'actually' " "going to go and take [Miller]'s side-by-side.' " Defendant maintained that he "had no idea that they were going to go steal something." Defendant testified that he said he did not want to be involved and told them to let him out of the car or take him home, but "they kind of laughed it off and continued driving." Defendant did not try to force them to stop the car because earlier in the evening, he saw that Pierce had a gun. According to defendant, Blakely and Pierce took the UTV, and one of Pierce's friends was supposed to meet them with a truck and trailer but never did. Defendant told them to bring the UTV to his parents' home in Gladstone because he wanted to return it to Miller, which he planned to do by having his mother contact Miller.

¶ 15 When they arrived, they parked the UTV. While defendant was out of sight of Blakely and Pierce, he saw that his parents were outside, checking to see what was happening. Defendant testified that he did not want Blakely and Pierce to see his parents because he did not want Pierce to know what they looked like. Defendant's mother told him that she had called the police, and he told her to go back into the house. At about that time, Blakely and Pierce came "walking around the corner and she took off walking." He testified that, while he intended to tell her to contact Miller, he "didn't get an opportunity to do that." Defendant then told Blakely and Pierce that his mother called the police, so they left. He testified that the next morning, Pierce and Palazzo picked him and Blakely up because they wanted to get the UTV from his parents' home. Defendant rode with them even though it was "[n]ot a good idea." Defendant claimed that he did not call the police because he knew that Pierce and Blakely "struggled" in their lives, and he

wanted to help. He did not "believe that the police should have been involved" because that would result in "miss[ing] work" and "com[ing] here" to court. Defendant still intended to return the UTV to Miller, but he went along with Pierce, Blakely, and Palazzo to "stay in decent graces" with them. Defendant overheard them discussing bringing the UTV to Stangland's residence. Although he "didn't think it was a very good idea because it was right in town," he wanted the UTV off his parents' property and did not want his parents getting involved. When they arrived at defendant's parents' home, Blakely and Palazzo told defendant to drive it to Stangland's home, which he did. After doing so, defendant tried to tell them to put the UTV "back where you found it," but "they didn't listen." Defendant testified that later that evening, he was at his parents' home when his father showed him Miller's Facebook post seeking information about his UTV. When his father asked if that posting referred to the vehicle defendant had the night before, defendant answered that it was but told him that he or his mother should contact Miller to get the UTV back to him. Defendant testified that he was not interested in the $500 reward but wanted to "motivate" Stangland, Blakely, Pierce, and Palazzo to "do the right thing."

¶ 16 On cross-examination, defendant testified that Pierce was "[p]robably not good company to have." Defendant could "only speculate on the things that I've heard about his past," but Pierce "would manage to get himself into some not-so-good situations." Defendant maintained that he "was trying to intervene to help" Miller so that his UTV was not lost, but his "hands were tied." Specifically, defendant did not want to anger Blakely and Pierce because Pierce had a gun, and defendant "was trying to not get shot." Additionally, defendant thought it was a "possibility" that Pierce might do violence against him or his family. Moreover, he did not want to call the police "because I don't like the police." Defendant also noted that he did not "want to be a snitch" and wanted to keep Pierce and Blakely "out of jail." According to defendant, he helped Miller

because, in his "educated guess," had he not suggested that Blakely and Pierce take the UTV to his parents' home, Miller would not have had his UTV returned to him.

¶ 17 During closing argument, the prosecutor contended that defendant was accountable for the theft and possession of the UTV because he "chose to be involved in [Pierce and Blakely's] criminal behavior before they engaged in it, and he facilitated it during the crime as well." Defendant's counsel argued that defendant's "true intent" was to return the UTV to Miller. Counsel acknowledged that defendant "could have" taken "a more reasonable action" and "probably should have called the cops right away" but argued that he was "between a rock and a hard place in righting this wrong."

¶ 18 The jury found defendant not guilty of theft but guilty of possession of a stolen motor vehicle. The trial court sentenced defendant to 3 years in prison, followed by 12 months of mandatory supervised release. No posttrial motions were filed.

¶ 19 This appeal followed.

¶ 20 II. ANALYSIS

¶ 21 Defendant argues that his trial counsel was ineffective for failing to request that the jury be instructed as to the affirmative defense of necessity. Defendant contends that, although he admitted he possessed the stolen UTV, the evidence established that he did so only to (1) prevent the UTV from being taken to an unknown location and ensure that it would be returned to Miller and (2) move the UTV from his parents' property for their safety. Defendant contends that counsel's ineffectiveness prejudiced him because, had the jury been properly instructed, it "may have" acquitted him on the basis of necessity. The State argues that counsel's performance was not deficient and that defendant cannot establish that he suffered prejudice.

¶ 22    To prevail on a claim of ineffective assistance of counsel, the defendant must establish that counsel's performance was deficient and that the deficient performance prejudiced the defendant to the extent that he was deprived of a fair trial. *Strickland v. Washinton*, 466 U.S. 668, 687 (1984). To show that counsel was deficient, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Hayes*, 2022 IL App (4th) 210409, ¶ 51. To meet the prejudice prong, a defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Hayes*, 2022 IL App (4th) 210409, ¶ 51. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v. Peeples*, 205 Ill. 2d 480, 513 (2002) (quoting *Strickland*, 466 U.S. at 694). A defendant must establish both prongs to be entitled to relief, and thus, the failure to satisfy either precludes a finding of ineffective assistance of counsel. *Hayes*, 2022 IL App (4th) 210409, ¶ 51.

¶ 23    Illinois law is clear that "counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of others, is a matter of trial strategy." *People v. Sims*, 374 Ill. App. 3d 231, 267 (2007). A reviewing court is highly deferential to counsel on matters of trial strategy, and the court must evaluate counsel's performance from his or her perspective at the time, not through hindsight. *Hayes*, 2022 IL App (4th) 210409, ¶ 52. As a result, a defendant must overcome the strong presumption that counsel's action or inaction may have been the result of sound trial strategy. *Hayes*, 2022 IL App (4th) 210409, ¶ 52. Indeed, matters of trial strategy are practically immune from ineffective-assistance claims, as the strategy must have been so unsound that counsel failed to undertake meaningful adversarial testing of the State's case against the defendant. *Hayes*, 2022 IL App (4th) 210409, ¶ 52.

¶ 24    The defense of necessity, as outlined in section 7-13 of the Criminal Code of 2012, provides:

> "Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." 720 ILCS 5/7-13 (West 2022).

¶ 25    Accordingly, to raise the defense of necessity, the defendant must show some evidence that he (1) "was without blame in occasioning or developing the situation" and (2) "reasonably believed that his conduct was necessary to avoid a greater public or private injury than that which might reasonably have resulted from his conduct." *People v. Janik*, 127 Ill. 2d 390, 399 (1989). A defendant is entitled to an instruction on the necessity defense if there is even slight evidence to support the theory. *People v. Taylor*, 2023 IL App (4th) 220381, ¶ 56.  However, the necessity defense is viewed as a "choice between two admitted evils where other optional courses of action are unavailable [citations], and the conduct chosen must promote some higher value than the value of literal compliance with the law [citation]." *Janik*, 127 Ill. 2d at 399. Importantly, a "necessity defense requires that 'the threat of harm was immediate and defendant's conduct was the sole option to avoid injury.' " *People v. Brown*, 2023 IL App (4th) 220399, ¶ 27 (quoting *People v. Boston*, 2016 IL App (1st) 133497, ¶ 39).

¶ 26    Defendant argues that counsel's failure to raise the necessity defense constituted deficient performance because the evidence established that he did not initially know why Pierce and Blakely were driving to Monmouth on January 3, 2023, and when he did learn of their plans, he asked to be let out of the car but was not permitted to leave. Defendant further claims that the

evidence showed that he reasonably believed possessing the UTV was necessary to (1) return the UTV to Miller, (2) prevent injury to himself, and (3) prevent injury to his family. The State responds that counsel was not ineffective, and defendant cannot show that he suffered prejudice because the necessity defense was unavailable to him under the evidence presented.

¶ 27    In support of his argument, defendant relies upon *People v. Shepherd*, 2020 IL App (1st) 172706, and *People v. Gullens*, 2017 IL App (3d) 160668. In *Shepherd*, the defendant was convicted of unlawful use or possession of a weapon by a felon after a firearm was found in her purse. *Shepherd*, 2020 IL App (1st) 172706, ¶¶ 5, 11. On appeal, the defendant argued that her trial counsel was ineffective for failing to raise a necessity defense where she had testified that (1) the firearm was placed in her purse without her knowledge and (2) she did not remove it because she did not want her fingerprints on it. *Shepherd*, 2020 IL App (1st) 172706, ¶¶ 9, 20. The appellate court agreed, determining that (1) the defendant presented evidence that she did not occasion the situation, since she testified that she did not place the gun in her purse; (2) there was evidence that she believed her conduct was necessary to avoid a private injury, since she testified that she did not want her fingerprints on the gun for fear of an implication that she owned it; and (3) the defendant's temporary possession of the gun in her purse, hidden from view, was a "better alternative to leaving the gun in plain view on the ground where anyone could find it, take it, and use it." *Shepherd*, 2020 IL App (1st) 172706, ¶¶ 25-27.

¶ 28    In *Gullens*, the State filed a petition to revoke the defendant's conditional discharge for a theft conviction after learning that he had possessed a stolen firearm while returning it to a retailer. *Gullens*, 2017 IL App (3d) 160668, ¶ 3. At the hearing on the petition to revoke, evidence was adduced that the defendant went to a firearm retailer with a group and that an individual from that group stole a gun without the defendant's knowledge. *Gullens*, 2017 IL App (3d) 160668,

¶¶ 5-6. When the defendant learned this, he possessed the firearm for about 10 minutes to return it to the store. *Gullens*, 2017 IL App (3d) 160668, ¶¶ 1, 5-6. Additionally, there was evidence that, had the defendant instead called the police, the person who stole the firearm might not have been present by the time the police arrived. *Gullens*, 2017 IL App (3d) 160668, ¶ 7. The defendant argued that he was entitled to a necessity defense because he possessed the gun only to return it to the store and keep it away from the public. *Gullens*, 2017 IL App (3d) 160668, ¶ 9. After the trial court determined that the necessity defense did not apply, the defendant was resentenced to three years' imprisonment. *Gullens*, 2017 IL App (3d) 160668, ¶¶ 15-16. The appellate court reversed, concluding that the defendant had no option other than to possess the firearm and return it to the store, since there was no guarantee that the police would be able to retrieve the firearm if they were called. *Gullens*, 2017 IL App (3d) 160668, ¶ 24. Additionally, the court determined that because a firearm otherwise would have been "out on the street," the defendant's action mitigated a specific and immediate threat to public safety. *Gullens*, 2017 IL App (3d) 160668, ¶ 25.

¶ 29        Defendant contends *Shepherd* and *Gullens* support his claim that he was entitled to a necessity defense because they stand for the proposition that an individual may possess an item where the harm that is sought to be prevented is the item's permanent loss. However, *Shepherd* and *Gullens* are clearly distinguishable, as those cases involved the defendants' possession of firearms, which posed a unique danger to the public if left accessible for anyone to take. See *Gullens*, 2017 IL App (3d) 160668, ¶ 25 ("We are inclined to believe that a specific and immediate threat to public safety occurs any time a stolen firearm is out on the street, as a stolen firearm may never be transferred legally."). Here, the UTV would have posed no similar danger to the public had defendant not possessed it or participated in Blakely and Pierce's plan. Accordingly, defendant's reliance on *Shepherd* and *Gullens* is misplaced.

¶ 30    Contrary to defendant's argument, we conclude that he has failed to establish that his counsel provided ineffective assistance. Where a necessity instruction, if tendered, would have been rejected, defendant's trial counsel cannot be deemed ineffective. *People v. Tenner*, 157 Ill. 2d 341, 377-78 (1993). Here, a necessity instruction would not have been warranted because there was no evidence to support the second element of the defense—that defendant "reasonably believed that his conduct was necessary to avoid a greater public or private injury than that which might reasonably have resulted from his conduct." *Janik*, 127 Ill. 2d at 399.

¶ 31    As to defendant's claim that he possessed the UTV to prevent Blakely and Pierce from permanently depriving Miller of it, defendant's possession of the stolen UTV was not the sole option to avoid that injury. Defendant had several opportunities to call the police, including when he was alone in the Lincoln at Miller's property after Pierce and Blakely left to take the UTV. Additionally, after the UTV was left at his parents' residence, defendant could have called the police at any point between when he returned to Oquawka and traveled back to his parents' residence the following morning. No evidence indicated that defendant was unable to contact the police. Indeed, defendant testified that the reasons he did not call the police were that he (1) wanted to help Pierce and Blakely, whom he knew were "struggl[ing]," and keep them "out of jail"; (2) did not want them all to "miss work"; (3) did not "want to be a snitch"; and (4) "d[id]n't like the police." Thus, nothing in the evidence presented suggested that calling the police was an option that was foreclosed to defendant; to the contrary, the evidence established that defendant simply chose not to pursue that avenue. See *People v. Legoo*, 2020 IL 124965, ¶ 34 (noting that the defendant, a sex offender, could not rely on the necessity defense to enter a public park to retrieve his son where other options, including calling the police for assistance, were available to him).

¶ 32    Defendant's remaining claims that he possessed the UTV to prevent harm to himself and his family are unavailing because he failed to identify any specific and immediate threat. Defendant testified that he participated in Blakely's and Pierce's plan because Pierce "had a gun on him" and defendant was aware of "his background," such that he knew what he was "capable of." Defendant, therefore, testified that he "was trying to not get shot." Even assuming that defendant's fear about Pierce's possession of a gun was genuine, defendant did not explain why he believed Pierce posed an immediate threat. Defendant testified only that it was "a possibility" that Pierce would have committed violence against him or his family. There was no evidence that Pierce threatened to harm defendant or his family if he did not participate in the plan to take the UTV. Nor was there any evidence as to what Pierce's "background" entailed or what, according to defendant, Pierce was "capable of." To the contrary, defendant admitted that he could only "speculate on the things that I've heard about his past." Thus, no evidence indicated that Pierce or Blakely were willing to retaliate against defendant or cause him or his family harm if he did not possess the UTV. See *Taylor*, 2023 IL App (4th) 220381, ¶ 66 (testimony that the defendant feared possible retaliation from the victim's friends was insufficient to warrant an instruction on the necessity defense where there was no evidence presented as to why the defendant believed the victim's friends posed an immediate threat and since the mere possibility that the victim's friends may have wanted to retaliate was not evidence of a specific or immediate threat).

¶ 33    Absent even slight evidence that defendant reasonably believed his conduct was necessary to avoid a greater public or private injury than that which might have resulted from his conduct, we conclude that defendant would not have been entitled to a necessity defense. Therefore, his trial counsel's failure to request an instruction on the defense did not amount to deficient performance.

¶ 34          Moreover, defendant cannot establish that he suffered prejudice. First, for the reasons described above, defendant cannot show that the result of the proceedings would have been different had counsel requested a necessity instruction. Given the lack of evidence that defendant reasonably believed his conduct was necessary to avoid injury, defendant would not have been entitled to a necessity defense instruction even if counsel had requested one.

¶ 35          Beyond that, even assuming the jury *had* been instructed on the necessity defense, defendant makes no convincing argument that the result of the proceedings would have been different. On appeal, defendant argues that, given that the jury acquitted him of theft, it must have found him credible, "at least with regard to the circumstances of the initial taking." Thus, defendant argues, given the consistency of his testimony and his account of the events, the jury "may have" believed that he possessed the UTV only out of necessity, such that the jury would have acquitted him if properly instructed. This argument is unconvincing. The fact that the jury acquitted defendant of the theft count cannot serve as proof that it would have found him credible as to the defense of necessity. "[A] jury may acquit a defendant on one or more counts on a multi-count indictment in the belief that the count on which it convicted the defendant will provide sufficient punishment." *People v. Sandy*, 188 Ill. App. 3d 833, 845 (1989). Accordingly, defendant's argument that the jury may have acquitted him amounts to no more than pure speculation. It is a "well-established rule that prejudice under *Strickland* cannot be based on 'mere conjecture or speculation.' " *People v. Johnson*, 2021 IL 126291, ¶ 58 (quoting *People v. Palmer*, 162 Ill. 2d 465, 481 (1994)). Accordingly, we conclude that defendant also cannot show that he suffered prejudice. Because defendant cannot show either deficient performance or prejudice as a result of his counsel's failure to request a jury instruction on the defense of necessity, his ineffective-assistance claim fails.

¶ 36                               III. CONCLUSION

¶ 37        For the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 38        Affirmed.