NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 220721-U

NO. 4-22-0721

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 22, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| DEMARCO M. JONES, | ) | No. 17CF1036 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John M. Madonia, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Harris and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirmed defendant's convictions for first degree murder and attempt (armed robbery) because (1) defense counsel acquiesced to the admission of the allegedly improper evidence and (2) counsel's decisions were part of a sound trial strategy that did not prejudice defendant.

¶ 2    In October 2017, the State charged defendant, Demarco M. Jones, by indictment with first degree murder (720 ILCS 5/9-1(a)(2) (West 2016)) and attempt (armed robbery) (*id.* §§ 8-4, 18-2(a)(2)). The State alleged that on December 21, 2016, defendant, or one for whom he was legally accountable, knowingly shot and killed Alaysia Bennett while attempting to commit an armed robbery.

¶ 3    In June 2022, a jury convicted defendant on all counts, and the trial court later sentenced him to 44 years in prison.

¶ 4    Defendant appeals, arguing that the trial court erred by (1) admitting excessive

other-crimes evidence, which the State then used for an improper purpose; (2) admitting certain phone records that were not properly certified as self-authenticating business records; and (3) permitting a detective to offer expert testimony about cell phone location data. Defendant concedes that he did not raise these issues at trial but argues the errors constituted either plain error or ineffective assistance of counsel. We disagree and affirm.

¶ 5                                    I. BACKGROUND

¶ 6                                    A. The Charges

¶ 7          In October 2017, the State charged defendant by indictment with first degree murder (*id.* § 9-1(a)(2)) and attempt (armed robbery) (*id.* §§ 8-4, 18-2(a)(2)). The State alleged that just after midnight on December 21, 2016, defendant helped plan and carry out an attempted armed robbery of a car in an apartment parking lot. When the driver of the car tried to get away from the robbers, Devante Taylor shot at the car several times, striking and killing Alaysia Bennett.

¶ 8                                    B. Relevant Procedural History

¶ 9          Because resolution of this case depends on matters of trial strategy, we highlight certain pretrial proceedings that give context for and help explain defense counsel's tactical decisions. We also summarize the trial testimony for further factual context.

¶ 10                              1. *A Brief Summary of the Crime*

¶ 11         At defendant's June 2022 jury trial, witnesses testified to the following. On the evening of December 20, 2016, defendant was riding around Springfield, Illinois, in a black minivan, drinking and smoking marijuana with his friends, Roderick Gailes, Jonesy Blackmon, Devante Taylor, and Shannon Robertson. Around midnight, the group pulled into a parking lot at Georgetown Apartments with the intention of robbing Delvon Peoples, a marijuana dealer, who was sitting in a car parked at the apartments. Taylor got out of the minivan with a gun and moved

toward the car. The car began to back up, and Taylor fired several times at the car. The minivan, driven by Gailes, began to pull away when Taylor started shooting. However, the minivan stopped so Taylor could get back in before it drove off. Shannon and Blackmon claimed to be asleep prior to the shooting as a result of the drugs they had taken.

¶ 12                    2. *Defendant's Statements to the Police*

¶ 13          In September 2019, the trial court conducted evidentiary hearings on defendant's *pro se* motion to dismiss the indictment and motion to suppress statements. The witnesses at these hearings, including defendant, testified that in February 2017, defendant informed the police during video-recorded interviews that he was at the scene of the homicide with Taylor, Gailes, and Blackmon. Defendant denied being involved in the crime but admitted he had been riding in the minivan, drinking and smoking. Defendant initially told the police that he fell asleep and did not wake up until after the shooting. Defendant later told the police that he was awake during the incident and that Taylor and Gailes were the ones who planned and executed the robbery. Defendant claimed that after Taylor shot at the car, defendant asked to be dropped off and went home. The trial court denied defendant's motions.

¶ 14                    3. *The State's Disclosure of Phone Records*

¶ 15          In October 2019, the State filed a proof of service of additional discovery described as "AT&T Certification of Authenticity; Letter from [Springfield Police Department] requesting records; AT&T Tower Search Records Key—Column Definitions for Tower Search Report." On that same day, the State filed a notice of intent to use a certification of regularly conducted activity, in which the State explained that it intended to use the geolocation data from phone numbers associated with (1) defendant, (2) Gailes, and (3) Blackmon to show that they were in the area of the homicide at the time of the offense. The State asserted that the "records custodians from service

providers Verizon and AT&T have provided certifications laying the foundation necessary to admit the phone records as records of regularly conducted activity." The State further asserted that the certifications complied with Illinois Rule of Evidence 902(11) (eff. Sept. 28, 2018) and copies of the relevant phone records and certifications had been given to defendant in the ordinary course of discovery. The proof of service shows that the State sent the discovery and notice directly to defendant at the county jail because defendant was representing himself at the time.

¶ 16          4. *Pretrial Proceedings Relating to the State's Evidence*

¶ 17          In July 2021, the trial court reappointed Sangamon County Public Defender Craig Reiser to represent defendant. Reiser had previously represented defendant in 2020 before defendant retained private counsel. However, private counsel withdrew in July 2021. The court appointed Reiser as defense counsel because (1) he had previously represented defendant in this case and (2) defendant informed the court that defendant believed he and Reiser communicated well and could work together.

¶ 18          In December 2021, defense counsel asked for a continuance because the State had recently produced thousands of pages of cell phone data and phone records obtained by the Springfield Police Department for certain witnesses, but not for defendant, Gailes, or Shannon. The State informed the trial court that it agreed with defense counsel and was doing its best to obtain and disclose the missing phone records. The court granted the continuance and conducted several hearings on the status of discovery relating to cell phone records over the next two months. In January 2022, the State represented it had produced all of the requested discovery, including phone records, to the defense.

¶ 19          That same month, the State filed a "Notice of Intent to Use a Certification of Regularly Conducted Activity," which stated the prosecution's intention to present "[g]eolocation

data from phone records associated with [defendant's] phone number" and included a certification that the State asserted met the requirements of Illinois Rule of Evidence 902(11) (eff. Sept. 28, 2018). (This was essentially the same notice the State had filed in 2019.) Subsequently, defense counsel indicated his agreement that documentary discovery was completed.

¶ 20 In November 2021, defendant filed a motion *in limine* to exclude Shannon from testifying about a different robbery that he heard the group committed after the shooting, when Shannon was no longer with the group. In late December 2021, the trial court conducted a hearing on defendant's motion. The State argued that it intended to present "testimony that the individuals in the van were generally riding around looking for someone to rob." The State acknowledged that Shannon had been dropped off after the murder and learned of the subsequent robbery from someone else. However, the State maintained that the remaining people in the van who were present for that later robbery could testify about it based on their personal knowledge. The State indicated that the evidence was crucial to its theory of the case that defendant was an accomplice because defendant's statements to police indicated that he would claim at trial that he witnessed the shooting but did not participate in its planning or agree to it. The trial court granted defendant's motion, concluding that Shannon's proposed testimony would not be relevant unless it was necessary to rebut defendant's testimony.

¶ 21 In March 2022, the State filed a motion to reconsider the trial court's ruling on defendant's motion *in limine*. In the motion, the State explained that (1) it had received new statements from Blackmon and Gailes that the remaining members in the minivan did attempt a robbery after the murder and (2) their statements were corroborated by cell phone location data. The State also explained that it intended to introduce evidence at trial that (1) Shannon and Taylor committed a burglary earlier in the day; (2) shortly before the murder, the group waited outside a

certain individual's house to rob him when he came home, but the man never came; (3) the group believed all of the targets of their crimes that day to be drug dealers; and (4) defendant's cell phone location data showed that he was in the areas where these other attempted robberies took place. The State also cited an unpublished decision from the Third District Appellate Court (*People v. Lomeli*, 2015 IL App (3d) 130687-U) that held the trial court properly permitted evidence of a subsequent crime because it was relevant to motive and intent. The State concluded that the post-murder robbery was (1) relevant to establish defendant's intent and (2) "necessary to give context to the GPS records from the night in question which will corroborate the testimony of Gales, Blackmon, Taylor, and [Shannon] Robertson."

¶ 22        In April 2022, the trial court conducted a hearing on the State's motion to reconsider. When asked for a position, defense counsel stated, "We will not be contesting that motion." The court stated, "That motion to reconsider will be granted without objection. Evidence previously sought to be admitted by the State will be admitted based upon positions taken by the parties."

¶ 23                                C. The Trial

¶ 24        In June 2022, the trial court conducted defendant's jury trial, which took five days to complete.

¶ 25                                1. *The State's Case*

¶ 26                                a. Preliminary Evidence

¶ 27        The State presented testimony from Peoples, the target of the armed robbery, and Derrick McFall-Smith, a passenger in Peoples's car, both of whom explained what they remembered from before, during, and after the shooting. Peoples testified that earlier in the evening, he had posted a photo to Snapchat of him holding a large amount of cash. Peoples and

McFall-Smith remembered that just as they were about to leave Georgetown Apartments, a black van pulled into the parking lot and stopped directly behind their car. A man wearing all black exited the van, approached the car, and fired several shots before the van drove off. When they realized Bennett had been shot, they rushed to the hospital while another passenger, Veronica Peoples, called 911. A pathologist confirmed that Bennett died from a gunshot wound.

¶ 28    Crime scene investigators testified that they recovered fired bullets from the car and Bennett's body and shell casings from the parking lot. Other officers testified that, based on information obtained from Blackmon and Gailes, they recovered a disassembled gun from storm drains located at two different intersections in Springfield. The gun, bullets, and casings were sent for forensic testing, and the experts who conducted that testing testified that (1) fingerprint analysis and DNA testing did not provide any helpful information and (2) the bullets and casings were fired from the disassembled gun retrieved from the storm drains.

¶ 29    The parties stipulated that (1) Martishaa Bolden, defendant's girlfriend at the time, purchased a train ticket for defendant to travel from Texas to Springfield, Illinois, on February 3, 2017, and (2) in December 2016 and January 2017, defendant was not permitted to leave the state (no reason for the restriction was given). The parties also entered a stipulation listing the phone numbers of several witnesses, including Bolden, defendant, and the group members who were in the minivan.

¶ 30    Natasha Whiteside, defendant's sister, testified that defendant called her twice in January or February 2017. In the first call, defendant informed Whiteside that he (1) was in Texas and (2) got a new phone number, which Whiteside recognized as a Texas phone number. Defendant called again a week later and asked if Whiteside was living with or hanging out with any of Bennett's family. Unprompted, defendant said, "[T]hat stuff with that girl was crazy."

According to Whiteside, defendant also told her "[h]e heard it was an accident."

¶ 31                                      b. Timothy Zajicek

¶ 32         Timothy Zajicek testified that for the last 17 years he had been a police officer with the Springfield Police Department and had been a detective since January 2015. Zajicek stated he had "homicide investigator training" and had "received advanced training in cell phone analysis and cell phone network analysis." Zajicek stated he reviewed and analyzed cell phone records as part of his regular duties as a detective in the "Crimes Against Persons Division" of the department.

¶ 33         Zajicek then testified extensively about how the police acquire and use cell phone records in investigations. In particular, Zajicek explained that phone records contain "call data," which details when a cell phone interacted with a cell tower to send or receive communications or other data. Call data provided dates and times of phone calls and text messages, whether the communication was incoming or outgoing, the phone number contacted, the duration of the communication, and, most importantly, which cell tower the subscriber's phone used to make the communication. Zajicek further explained what cell towers were, how they work, and that carriers have many of them throughout Springfield. Cell phones typically use the nearest tower; however, when multiple towers cover the same area, phones may be routed to a different tower with more capacity (fewer phones using it) or a better signal (due to weather). Zajicek then detailed for the jury how phone companies acquire, calculate, and use cell phone location data, which they use to monitor and improve the efficacy of their networks.

¶ 34         Zajicek testified that he examined AT&T's cell phone records for defendant's phone, including (1) a certification letter from AT&T "authenticating the records that they sent," (2) subscriber information, (3) call data records, and (4) "historic precision location information" called "NELOS." Zajicek explained that NELOS was a proprietary system used by AT&T for

- 8 -

location data and "NELOS data can be more detailed and can be a better representation of where a device is based on AT&T measurements than just the tower data alone."

¶ 35    The State moved to admit and publish these phone records for defendant's phone. The trial court asked, "Any objection?" When defense counsel responded, "No, Judge," the court stated, "They will be so admitted without objection and subject to publish." Zajicek then detailed for the jury the call logs relating to defendant's phone throughout the day and night of the murder, listing the phone number called or calling defendant, the time of the call, and the call's duration.

¶ 36    Regarding location data for defendant's phone, Zajicek testified that the Springfield Police Department uses "a company called ZedEx" to analyze location data. Zajicek explained that the department uploads the phone records into the ZedEx program, which then analyzes the data and plots AT&T's location data on a map. Zajicek testified that he created maps using ZedEx and Google Earth to help determine where defendant's phone was located on December 20 and 21, 2016. The State moved to admit the maps, and defense counsel again responded, "No, Judge," when asked by the trial court if there was any objection.

¶ 37    At this point, Zajicek went through each of the maps, which showed a shaded area or circle estimating that defendant's phone was located somewhere in that area and the time the phone made or received a call. The maps showed that defendant's phone went to various houses, including one on Edwards Street, an intersection containing a liquor store and a KFC, an AutoZone, then to several more addresses and houses, including (1) Bolden's home, (2) an area near a middle school on Jackson Street, (3) Georgetown Apartments, (4) the state fairgrounds, and (5) the area of the subsequent robbery referred to in the parties' motions *in limine*. Zajicek also testified that location data showed defendant's phone traveling to East St. Louis and back to Bolden's home in Springfield the morning after the murder.

¶ 38    Zajicek testified that all cell activity on defendant's phone stopped on December 21, 2016. However, Zajicek obtained records for a new number associated with defendant, which he acquired on December 22, 2016, and those records showed defendant's phone traveling from Springfield to Ft. Worth, Texas, on January 2 and 3, 2017. Like the previous records, defense counsel informed the trial court the defense had no objection to the admission and publication of the exhibits.

¶ 39    The State then asked Zajicek whether he analyzed phone records, also from AT&T, relating to Gailes's cell phone. Zajicek stated that he had and proceeded to testify about those records in a similar manner as he had for defendant's cell phone. When the State moved to admit and publish the phone records, defense counsel again stated, "No objection," and when the trial court asked if the defense had any objection to admitting the two maps Zajicek created for Gailes's phone, counsel responded, "None."

¶ 40    The State then repeated the process with respect to a Verizon phone number that, according to the stipulation, belonged to Blackmon. The testimony followed the same pattern of listing a few calls and reviewing a map showing location data at the time of the call. One of the maps showed the locations of both Blackmon's phone and defendant's phone between 7 a.m. and 9 a.m. on December 21, 2016, which reflected that both phones tracked each other and traveled from Springfield to East St. Louis.

¶ 41    Zajicek testified that both defendant and Gailes used AT&T for their cell service. When asked if the phones "made use of the same sets of towers," Zajicek answered, "More than likely. If those devices were in close proximity to each other, it was likely they would use the same tower." Zajicek stated that he compared the "tower data" for the two phones and created a document reflecting the towers used "[d]uring these time periods both phone numbers were using

accounts or using towers that were consistent with one another." The document was admitted after defense counsel again indicated he had no objection. Zajicek testified that both phones used the same towers starting around 2 p.m. on December 20, 2016, and ending at 3 a.m. on December 21, 2016.

¶ 42    The State asked Zajicek whether the data reflected what he would expect to see if two individuals were together, namely, "two phones making use of the same tower." Defense counsel objected, arguing the question called for speculation. The trial court overruled the objection, explaining, "No, I think [Zajicek's] given enough expertise and enough background to be able to answer that question; and it will go to weight, not admissibility." Zajicek then answered that "[i]f the cellular devices for each phone number were in close proximity to each other, it would be likely they would use the same tower."

¶ 43                                     c. Jonesy Blackmon

¶ 44    Jonesy Blackmon testified that he had known defendant for 10 years, was Taylor's familial cousin, and was a longtime friend of Gailes. Blackmon stated he was in the minivan when Bennett was shot.

¶ 45    Blackmon admitted he had prior convictions in 2011 and 2014 for delivery and possession of controlled substances. Blackmon further admitted that he was convicted of delivering a controlled substance in 2017. After the 2017 conviction, while awaiting sentencing, Blackmon agreed to speak with the police about the Bennett murder in exchange for immunity for his statement. The State introduced a copy of the signed immunity agreement.

¶ 46    In December 2016, Blackmon was living in East St. Louis. On December 20, Blackmon got dropped off at a KFC in Springfield, where he met up with defendant, Taylor, Gailes, Shannon Robertson, and Shannon's brother, Eric Robertson. Blackmon stated the group

soon left and began riding around in a black Dodge minivan owned by Shannon. According to Blackmon, everyone in the minivan was smoking marijuana and drinking "Lean," which is a mixture of prescription cough syrup (containing codeine and promethazine) and soda, which makes the drinker sleepy.

¶ 47        Blackmon testified that he remembered driving around Springfield but only remembered a few specific locations. Blackmon stated that they stopped at an AutoZone store and later dropped off Eric on Edwards Street. At some point, people in the minivan began discussing committing robberies. Blackmon initially testified that Shannon identified a man named Julius to rob, but the State impeached him with a prior statement to the police in which Blackmon stated defendant saw Julius leave his house and instructed the group to pull over so they could rob the house. Blackmon explained that Julius was targeted because he sold marijuana. Shannon and Taylor broke into the house but returned with something insignificant, like a cup of change.

¶ 48        The State then asked Blackmon if (1) "[a]t any point *** leading up to the shooting" they stopped at Bolden's house and (2) "at some point in the evening [wa]s there a gun in the [minivan]?" Blackmon answered yes to both questions and testified that Taylor was holding the gun "[b]ecause [defendant] didn't want to hold it." Blackmon stated that he fell asleep in the minivan while they were parked on Capitol Avenue waiting "[f]or hours" to rob another marijuana dealer, named "JB," but he never appeared.

¶ 49        Blackmon testified that when he woke up, they were at Georgetown Apartments. Blackmon remembered waking up and hearing (1) defendant tell Taylor to "go, go, go, like go to the car" and (2) Shannon telling Taylor to "stand down." Taylor, who was wearing all black clothes, was already out of the minivan and approaching the passenger side of a car. Blackmon saw the car's brake lights illuminate suddenly. Blackmon believed the car "tried to pull off," but

he could not tell because (1) the minivan, driven by Gailes, "pulled off" to exit the parking lot and (2) Blackmon laid down when he heard gunshots. Shortly after the minivan left the parking lot, the van stopped, and Taylor got back in.

¶ 50    Blackmon stated they made their way to the area around the state fairgrounds, at which time a state trooper began following them. Blackmon said they let Taylor out of the minivan on a side street because he had the gun and then drove the van a few blocks down the road to a liquor store. After the "police officer, they turned around and drove back by," they circled the area for several minutes until they found Taylor, who rejoined them while still holding the gun.

¶ 51    Blackmon testified that the group then drove to Bolden's house to switch cars. The group dropped the minivan off at a house on Edwards Street and got into Bolden's vehicle, a tan Nissan.

¶ 52    The State then asked Blackmon whether the group attempted another robbery after the shooting. Blackmon said the group went to a house near the corner of 19th Street and "Cedar" or "Spruce." Blackmon said Taylor, alone, attempted the robbery but was unsuccessful. Blackmon saw Taylor go around to the backyard and then heard a couple of gunshots. Taylor ran back to the minivan, unharmed.

¶ 53    Later on, the group dropped Gailes off at his home, and Blackmon went to a house owned by a man named Julian. While there, Julian received a phone call and relayed to Blackmon that Bennett had been shot and died.

¶ 54    The State then asked Blackmon if he knew what happened to the gun Taylor used. Blackmon stated the gun "was broke down and thrown in the sewer." Blackmon explained that he was present at Gailes's house when defendant had the idea to take the gun apart and dispose of it in the sewer. Defendant disassembled the gun. Blackmon stated that Taylor and Gailes each took

a piece of the gun and threw them in different sewers; Blackmon knew where Taylor threw away his piece but not where Gailes threw the other piece. After the gun was thrown away, at around 6 or 7 a.m., defendant drove Blackmon and Taylor back to East St. Louis.

¶ 55      Blackmon testified that he told the police where a portion of the gun was hidden and showed the jury the location on a map.

¶ 56      On cross-examination, Blackmon agreed the police were trying to talk to him about the Bennett murder in early 2017, but he told them he would not do so without a lawyer. Further, Blackmon acknowledged he was charged in 2017 for an unrelated drug offense that he had committed months before the Bennett shooting. Shortly after Blackmon was convicted of that drug offense in September 2017, while facing a prison sentence of 4 to 15 years, the police came to him looking for information about the Bennett case. In less than 10 days, the State had entered into an immunity agreement with Blackmon, and the police conducted a recorded interview with him. Blackmon entered the immunity agreement so he would not be charged with murder. He also acknowledged that after he gave his recorded statement, he reached an agreement with the State to be sentenced to the statutory minimum of four years in prison.

¶ 57      Blackmon agreed that of all the people in the minivan, he was closest friends with Gailes. Blackmon also agreed that (1) he never heard anything about a plan to rob someone prior to waking up at Georgetown Apartments and (2) defendant never left the car. However, Blackmon remembered hearing Peoples's name at some point before he fell asleep.

¶ 58      On redirect, Blackmon stated that he heard "mostly" Gailes and defendant talking about Peoples.

¶ 59          d. The Discussion of Other-Crimes Evidence

¶ 60      During a recess before the State called its next witness, the trial court discussed

with the parties whether a limiting instruction should be given before any further other-crimes or bad-acts evidence was presented. The court (1) identified "the potential purpose[s] of intent and knowledge about what was taking place" as two potentially permissible bases to introduce other-crimes evidence and (2) stated that it was inclined to give a limiting instruction to the jury before such evidence was presented.

¶ 61 Defense counsel then addressed the trial court as follows:

"Judge, we would like to research that a little bit. I'm not sure I want that brought *** to the jury's attention, particularly with the Court reading it in the middle of the trial. And we may ask for it. We may ask for it still in this trial. But we also may ask for it during jury instruction conference, and that it be read with the other jury instructions."

¶ 62 After mentioning the IPI comments on the issue, the trial court stated the following: "[C]learly I'm trying to protect this jury from considering things inappropriately. But if you [(defense counsel)] believe it would cause more concern to this jury to hear this instruction at that time either before or after the jury has heard the evidence immediately, then I would consider then withholding that instruction and just saving it for their deliberations."

¶ 63 The State told the trial court that it had no objection to limiting the purpose of the evidence to intent and knowledge. The court clarified that "what I don't want is for this evidence to be heard and then tomorrow buyer's remorse and say, oh, Judge, I want the jury instructed, you know. I mean, it's kind of like now [or] never." Defense counsel replied, "Well, Judge, I had thought about this obviously beforehand. And I don't want it to be brought to the jury's attention by the Court. It was my concern." The court said it would "stand down because I don't think it

- 15 -

was overly involved in that last witness's testimony" and the court had now "brought it to everyone's attention."

¶ 64                                    e. Devante Taylor

¶ 65        Taylor testified that he was from East St. Louis and in 2016, he lived in Belleville, Illinois. On December 20, 2016, Taylor drove to Springfield with Blackmon (whom Taylor described as his "blood cousin") and Blackmon's girlfriend. Taylor and Blackmon met up with defendant, Shannon, Eric, Gailes, and two other individuals at a KFC around 7:30 p.m. Taylor left with everyone in a "grayish" Dodge Caravan, which Taylor thought Eric owned because Eric was driving it. Taylor said the group drove around smoking marijuana and drinking Lean. Taylor stated that he did not have his own phone at the time but he had Gailes's phone on him that day and used it to make calls.

¶ 66        Taylor said the group went from the KFC to an AutoZone and then "to a guy name[d] Smokey Bones." Taylor explained they waited in the minivan outside Smokey Bones's residence and planned to "rob him for I guess his weed and his money." Smokey Bones never came home, so the group left after waiting for about 40 minutes. This occurred about four hours before the shooting.

¶ 67        Taylor testified that defendant, Gailes, and Blackmon had "discussions" about robbing people. The State asked if, while driving around that night, "at any point is there a gun in the car?" Taylor said yes, and the State asked, "How did the gun end up in the car?" Taylor explained that "Gailes stopped at a house, got the gun, gave the gun to [defendant]. [Defendant] gave the gun to me." Taylor denied that defendant went inside to get the gun, insisting that "a guy came outside." The State asked if Taylor told the police during an interview that defendant got the gun, and Taylor responded, "That's a lie," and insisted he told the police that someone came out

- 16 -

and gave the gun to Gailes, who handed it to defendant.

¶ 68        Taylor testified that when the group arrived at Georgetown Apartments, Gailes was driving, Shannon was the front passenger, Taylor was in the next row seated behind the driver, with Eric and defendant next to him, and Blackmon was in the back row. Taylor denied telling the police that Eric was not in the minivan and insisted Eric was present. Taylor testified that he knew they were at the apartments to rob someone but did not know whom. When the minivan entered the parking lot, it stopped behind a black Mazda. Defendant then handed Taylor a gun and told him to "hit that car," which Taylor understood to mean rob the black Mazda. Taylor stated a gray car was parked on the opposite side of the lot and denied defendant said anything to him about the gray car. The State impeached Taylor with statements from his police interview, statements he could not recall if he made, that defendant (1) told Gailes to "block the black car in" and (2) told Taylor, "no, don't hit him, don't hit him, get the black car."

¶ 69        Taylor testified that he was wearing all black, exited the minivan, and headed for the driver's side of the Mazda. As Taylor approached, he saw an occupant "raise[ ] something up," so Taylor shot at the driver. The car backed up, trying to hit Taylor, who shot again. Taylor noticed that the minivan was gone, presumably having driven off, and he was alone. The Mazda then drove forward through some bushes and out of sight.

¶ 70        Taylor testified that he "took off running," ran past some houses, and then heard some people screaming his name. Taylor looked up to see the minivan, which he got in, rejoining the group. After the shooting, the group dropped Gailes off at his home. Taylor stated that, next, "[t]hey took me, [defendant,] and Blackmon to [defendant's] girlfriend['s] house" and the three of them got into Bolden's golden-brown Nissan sedan.

¶ 71        The State then asked what happened to the gun. Taylor replied, "We broke it down

[into multiple pieces] at Gailes'[s] house and we disposed it." Taylor estimated this occurred around 4 or 5 a.m. Taylor stated Blackmon, defendant, and Gailes came up with the idea to "dispose of th[e] gun." He wanted to take it to back East St. Louis, but the other three said no, deciding instead to throw the parts into a sewer. Taylor said Blackmon and Jones were present when Taylor and Gailes threw the gun parts into the sewer. They then went back to Gailes's home. From there, Taylor drove to East St. Louis in the Nissan, accompanied by Blackmon and defendant. Taylor dropped off Blackmon, then drove to his own home. Defendant drove off after Taylor got out.

¶ 72        The State showed Taylor an affidavit that Taylor wrote in which Taylor claimed defendant had nothing to do with Bennett's death. Although the affidavit stated that Taylor was not forced or coerced to write it, Taylor asserted at trial that nothing in the affidavit was true and he wrote it because defendant promised to pay him, which he never did.

¶ 73        The State concluded its direct examination of Taylor by asking him to describe each participant's role in the crime. Taylor said Blackmon's role was bringing Taylor to Springfield, Gailes was the driver, and Shannon really did not have a role. When asked about defendant, Taylor stated, "He was the gun man and the mastermind."

¶ 74        On cross-examination, Taylor admitted that he had pleaded guilty but mentally ill to the first degree murder of Bennett and was sentenced to 50 years in prison. Taylor explained that when he entered his plea, he was under the impression that the "mentally ill" plea meant he would serve half of his sentence in prison and the rest in a mental facility. Taylor agreed that as soon as he found out that he had to serve all 50 years in a prison, he had "been trying to find a way to get a better deal." Taylor acknowledged sending letters to the state's attorney's office and the trial court trying to reduce his sentence. Taylor even testified that he was in court that day in an

effort to "get a better deal" and he was still trying, at that very moment, to get a better deal.

¶ 75        Taylor repeatedly acknowledged that he (1) initially denied having any involvement in the shooting and (2) changed his story several times while talking to the police. Taylor reiterated dozens of times during cross-examination that he lied to the police in his initial interviews because he was trying not to get caught. However, Taylor stated he eventually decided to tell the truth to alleviate his guilt. In response to dozens of questions about the police interviews, Taylor denied having ever made certain statements to the police. Defendant played portions of the recorded interviews to show Taylor's trial testimony was inaccurate.

¶ 76        Taylor also insisted that Shannon, Eric, and two other individuals, whose names he did not know, were in the minivan and part of the group the entire night.

¶ 77                        f. Shannon Robertson

¶ 78        Shannon testified that he was staying in Springfield in 2016 and was involved in the Bennett shooting. Shannon admitted he was convicted of the manufacturing and delivery of cannabis in 2010 and of driving while his license was revoked in 2021. Shannon testified that he did not have a great recollection of what happened on December 20, 2016. He could not remember how he met up with defendant but did know that they were together in a dark blue van at some point. Shannon was unsure if his brother, Eric, was with them but recalled that defendant and Shannon picked up (1) Blackmon, (2) Gailes, and (3) someone he did not know. Shannon testified that, including himself, five people were in the minivan. Shannon never learned any name— "nickname or regular name"—of the fifth person, although he was sure he heard it from others that night. However, a few days after the incident, Shannon learned that the fifth person was Blackmon's cousin and was from St. Louis.

¶ 79        Like the others, Shannon testified that the group of five men drove around

Springfield smoking marijuana and drinking Lean. Shannon repeatedly expressed that he had a hard time remembering the night and could not remember much of what occurred. The State asked what Shannon's next memory was after getting in the minivan, and Shannon responded, "I was woken up to—I don't know if [Blackmon] woke up and told me or [Gailes] or one of them woke up and told me that, uhm, they just hit, like they trying to rob someone [from] out [of] your van."

¶ 80       Upon hearing this statement, Shannon testified he said, "No," but Blackmon's cousin, Taylor, was already jumping out of the minivan with a gun and "started shooting." Before that moment, Shannon was unaware that anyone in the minivan had a gun. Reacting to the gunfire, the people in the minivan told the driver, Gailes, to "go." Shannon testified that he was telling Gailes to leave without Taylor. The minivan pulled off and went around the front of the building when Taylor suddenly appeared, got in front of the van, and jumped back in. The group then drove away.

¶ 81       Shannon stated they drove "up 9th Steet by the fair [grounds]. [A] state trooper got behind us. We pulled over." The group pulled into the driveway of a house, and Taylor, because he still had the gun, got out of the minivan and pretended like he lived in that house. Shannon stated that "troopers kept going passed [*sic*]." The group "sat there" until "the state trooper went back passed [*sic*]" and presumably left the area. Taylor then reentered the minivan, and the group drove off.

¶ 82       Shannon again testified that he could not remember what happened afterwards, stating "that day was kind of blurry because I was drinking Lean." Shannon believed all five people were still in the minivan but could not remember any conversations other than Blackmon yelling at Taylor. Shannon testified that he could not remember defendant making any statements.

¶ 83       The State impeached Shannon with his statement to the police that defendant said,

"I hope you hit his ass," which Shannon did not remember making. Shannon testified that he remembered telling the police that defendant said "go, go, go" when Taylor jumped out of the car but noted that everyone was shouting at Gailes to "go," including defendant. Shannon conceded he could not remember the precise timing of when defendant said "go, go, go" and did not remember telling the police that defendant made that statement before Taylor exited the minivan.

¶ 84 Shannon further testified that after avoiding the state trooper, they went to a house on the east side of Springfield and dropped off defendant, Blackmon, Taylor, and Gailes. Shannon believed it was Gailes's "baby mama['s] house" but was not sure. Shannon then drove the minivan to his friend's house and slept on the couch. The next day, Gailes told Shannon that Taylor had killed a woman when he shot the car and Shannon should leave town, which Shannon promptly did.

¶ 85 g. Roderick Gailes

¶ 86 Gailes testified that on December 20, 2016, he was hanging out at an apartment when defendant, his friend of several years, called him and asked if he wanted to "ride around and smoke." Gailes said yes. While waiting to be picked up, Gailes was joined by Blackmon, a lifelong friend, and Taylor. Defendant arrived in a black minivan accompanied by Shannon, Eric, and Walter Grant. Defendant asked Gailes to drive because Gailes had a valid driver's license. The entire group left in the minivan, drove around, smoked marijuana, and drank Lean.

¶ 87 The State then asked Gailes if the group discussed "activities moving forward in the day." Gailes answered that defendant initiated a discussion with Shannon about breaking into an individual's house. At this point, the trial court requested and conducted a sidebar with counsel. The following exchange occurred:

"THE COURT: So, when we left off yesterday, you [(defense counsel)] said

can I have some time to do some research on whether or not you thought it would be appropriate for your client to have the jury instructed about other conduct evidence. Now would be the time, if you're going to continue to object, to me doing that and state it for the record that you don't want me to inform the jury about this instruction. Otherwise, I'm going to instruct them that they should only consider it as it should be considered and for the limited purposes of intent and knowledge.

[DEFENSE COUNSEL]: Judge, I understand. And we have come to the decision that we are going to request that jury instruction to be read to the jury at the conclusion of the case.

THE COURT: Not before the evidence is heard in the trial?

[DEFENSE COUNSEL]: That is correct, Judge.

THE COURT: Okay. All right. And that's a trial strategy?

[DEFENSE COUNSEL]: That is a trial strategy, Judge."

¶ 88    Gailes then testified that defendant told him to drive to a house owned by a man named Julius, who sold marijuana, so they could break in and rob him. Blackmon and defendant told Taylor to knock on the door to see if anyone was home. After Taylor returned to the minivan and confirmed no one was home, Taylor and Shannon broke into the house but did not take anything.

¶ 89    Thereafter, Gailes dropped Eric off at Eric's house. Defendant then told Gailes to take him to get defendant's gun. Defendant directed Gailes where to turn and eventually led him to a house on Jackson Street, from which defendant retrieved a gun. When defendant returned, he told Gailes to "go out west" so they could rob a man named Fontaine, who also sold marijuana. Defendant instructed Gailes to pull into an alley near Fontaine's house and told Taylor to go rob

Fontaine as soon as he came outside. However, despite waiting for such a long time that Gailes fell asleep, Fontaine never came outside.

¶ 90 Gailes testified that when the group woke him up, they told him they had found a "swerve," someone who buys drugs, at Georgetown Apartments and Gailes drove to that location. Upon arrival, defendant told Gailes to drive to the back of the apartment complex. As they passed a particular parking lot, defendant said, "[W]e got one," which Gailes understood to mean someone to rob. Taylor asked who the target was, and defendant said, "Von [Peoples]." Gailes turned around and headed back in the other direction. Defendant instructed Gailes to turn left into a parking lot and then ordered him to stop.

¶ 91 Gailes testified that when he stopped, the minivan's door slid open. Gailes looked back and saw defendant hand the gun to Taylor, who grabbed it and started to get out of the minivan. Gailes testified that he heard defendant say, "[G]o, go, go." Gailes then testified, as follows:

> "That's when I said no, no, no. Once I realized what was going on, I'm telling him
> no, no, no. And that's when [Shannon] say no. And [defendant] like, man, go, go,
> go. And he, uhm, he push him out the van. And when he push him out the van, I
> got scared and I pulled off. And once I pulled off, that's when the—that's when I
> heard shots."

¶ 92 Gailes sped up once he heard the shots, but defendant told him to stop. Gailes hesitated, and defendant became aggressive, shouting, "stop [be]for[e] I knock your ass out." Gailes stated he saw how serious defendant was so he stopped out of fear "[a]nd that's when [Blackmon] woke up." Gailes continued:

> "And, uhm, he's like what the fuck going on, where my cousin at. And that's when

- 23 -

[defendant] slide the door. [Taylor] run, jump back in the car or in the van. [Blackmon] get to yelling what the fuck you make him do that, man. Everybody yelling and arguing with each other, and I pull off."

¶ 93 Gailes testified defendant told him to drive to Bolden's house, and that when they arrived, Shannon got out and left and defendant went into the house. Defendant later returned and told everyone to come with him and that they were getting out of there. Gailes, Taylor, Blackmon, and defendant got into Bolden's car, and defendant drove off.

¶ 94 Defendant drove around until he ended up at a stop sign at the intersection of 19th Street and Spruce Street. Defendant said, "[T]hey got some money in there." Defendant asked Taylor to go in and "see what they got." Taylor complied, and when he returned, Taylor said he did not get anything. Taylor explained that when he got into the garage, he slipped, and "they shot at me." Defendant drove off. Gailes asked Taylor for his phone back, but Taylor said he dropped it. Irritated, Gailes asked defendant to drop him off at home, which defendant did.

¶ 95 Gailes testified that he went to bed and woke up a few hours later to someone knocking on his door. Gailes saw Taylor standing at the door, so he cracked it open and asked what was going on. Gailes testified that defendant and Blackmon then came to the door and everyone "look[ed] all crazy." Blackmon said someone died, and Gailes let them in. As Blackmon explained that Bennett was shot at Georgetown Apartments, Gailes saw defendant pull out the gun. Defendant looked at Gailes and said they had to get rid of it.

¶ 96 According to Gailes, defendant borrowed someone's phone and looked up how to take the gun apart on YouTube. Gailes testified that everybody present helped take the gun apart. Defendant repeated that they had to get rid of the gun. Gailes took the top portion of the gun, known as the slide, and drove by himself to Milton Street, where he dropped the slide into a sewer.

Gailes testified that the group did not discuss how or where to dispose of the gun, and defendant, Taylor, and Blackmon left in Bolden's car. Gailes acknowledged that he told the police during an October 2017 interview that he knew where the others disposed of the rest of the gun and he marked their locations on a map. Gailes maintained that when he was driving around looking for a place to get rid of the slide, he saw Bolden's car near a sewer on Sangamon Street and someone standing outside of the car.

¶ 97   Gailes acknowledged that he was charged with the same offenses as defendant and those charges were still pending.

¶ 98   On cross-examination, Gailes agreed that when he first met with the police, on October 2, 2017, he denied knowing anything about the case. Defense counsel went into great detail when asking Gailes questions about the interviews he gave to the police, the tactics the police used to convince Gailes to talk, and the cooperation agreement with the State that Gailes signed, which granted Gailes immunity for his testimony at trial against defendant.

¶ 99   *2. Defendant's Case*

¶ 100   Defendant called Christopher Ettress, who testified that he was serving time in the Sangamon County jail and had several conversations with Gailes. Ettress provided an affidavit describing jailhouse conversations with Gailes. According to Ettress, Gailes told Ettress that he felt bad "lying on" defendant because Gailes ended up charged with murder anyway. Ettress testified that Gailes told him he lied about defendant's obtaining the gun; that Gailes actually provided the gun, broke it down, and later threw it in the sewer. Ettress testified that Gailes told him that he lied about defendant's telling Taylor to commit the offense and that Gailes and Taylor were the ones who planned and committed it. Gailes lied so he could go home; he did not want to tell on Blackmon, his "homey."

¶ 101    Defendant chose not to testify.

¶ 102                          3. *Closing Arguments*

¶ 103                          a. The State's Closing Argument

¶ 104    During closing argument, the State used the cell phone location data, particularly Zajicek's maps, as a framework to demonstrate how the phone data corroborated the witness testimony and illustrated the timeline of events. The State even quipped, "There's a map for that." The State explained that (1) the maps confirmed that defendant, Gailes, and Blackmon were at the locations described by the witnesses and (2) the events unfolded in the manner the witnesses described. The State described how the group met at KFC, visited AutoZone, broke into Julius's house, picked up a gun on Jackson Street, and then waited at the address Gailes gave for Fontaine. Then they went to Georgetown Apartments. The State described how the group thought the police were following them while they were near the fairgrounds and defendant's phone was in that area just minutes after the murder. The phone location data also confirmed that the group was near 19th Street and Spruce Street, at which location Blackmon and Gailes testified that they attempted a robbery.

¶ 105    The State argued extensively that defendant was the person who planned the entire operation and was in charge of the group's movements that night. In particular, the State emphasized the testimony from Gailes and Taylor that defendant gave Taylor the gun and told him to rob Peoples. Defendant also forced Gailes to stop so they could pick up Taylor, told Taylor to rob the black car and not the silver car, and said that he "hope you hit his ass" as they were leaving the shooting. The State further emphasized that defendant came up with the idea of changing cars and getting rid of the gun, and he drove Blackmon and Taylor back to East St. Louis. The State noted that defendant went to Texas shortly after the murder even though he was prohibited from

leaving the state. And while he was in Texas, defendant made sure to call his sister to discuss the murder, suggesting it was an accident and telling her to stay away from the Bennett family.

¶ 106    The State told the jury that defendant would try to say that the jury should not believe the State's witnesses because they were criminals and liars trying to save their own skin. The State agreed the witnesses participated in the events of that night and had criminal histories but pointed out to the jury that the State did not get to pick its witnesses. The mere fact that they were criminals did not mean they were lying about the events of that night.

¶ 107    The State argued in particular that Taylor had below average intelligence and was clearly easily influenced, particularly by defendant, who convinced him to sign an affidavit in exchange for money. The State also argued that the jury should remember Gailes's tone and demeanor while being cross-examined by defense counsel, who sarcastically accused him of lying to save himself, which the State argued showed Gailes refused to get angry and take the bait, instead resolutely expressing that the family deserved to know the truth.

¶ 108    The State further pointed out that Gailes and Taylor gave confessions or consistent interviews before they entered into any cooperation agreements. The State acknowledged that Blackmon blew the case wide open in exchange for immunity but stated the practice was common and his testimony was corroborated by more reliable evidence, such as the location of the gun parts and the phone location data.

¶ 109    b. Defendant's Closing Argument

¶ 110    Defense counsel focused mainly on the credibility of the State's witnesses. Counsel stated, "I freely admit [defendant] was with them in the van. He was with that cast of characters, but there is a big difference when you think about that." Counsel then went on to emphasize the credibility determination the jury needed to make about the eyewitnesses and how that factored

into whether the State met its burden of proof.

¶ 111    Defense counsel argued that the State used criminal charges or the threat of charges and immunity agreements to get the eyewitnesses to say what the State wanted them to say. Defense counsel also argued that the inconsistencies in the eyewitnesses' testimony made it so that the jury could not find defendant guilty beyond a reasonable doubt. Defense counsel also argued that the criminal records of the eyewitnesses made them not credible.

¶ 112    Defense counsel addressed the phone evidence and acknowledged that it showed defendant was at the locations at issue in this case. However, defense counsel contended that the records for Blackmon and Shannon showed the same things. Defense counsel argued, "Are they charged with [m]urder? No. Just because [defendant] is at these places doesn't mean that he should be charged with murder." Defense counsel argued that the records showed where people were but "[t]hey don't tell you what things were said in the van." Defense counsel stated, "The most important piece of phone evidence is what we didn't hear from the State's phone evidence," and counsel emphasized that the evidence showed that (1) only Gailes had the Snapchat video in which the money was flashed and (2) there was no evidence defendant had knowledge of that video. "That is crucial," counsel argued. "You know that if the State had evidence that [defendant] had that on his phone, you would have heard about it."

¶ 113    Defense counsel went over the evidence that showed the involvement of Gailes and Taylor. Defense counsel argued, "It's believable and plausible that *** Gailes, sent [Taylor] out to do this crime." Counsel asserted that Taylor was trying to "save" Gailes. Defense counsel said, "If you believe it's any way possible that this was [Gailes's] and [Taylor's] armed robbery, you cannot convict [defendant]. If it's any possibility, you can't convict him with proof beyond a reasonable doubt. You just can't." Defense counsel argued, "In order to convict [defendant], you

have to believe there was proof beyond a reasonable doubt that there is no way that *** Gailes was the mastermind." Defense counsel argued, "It is absolutely plausible that the, 'Go, go, go' being said was not [defendant], that it was [Shannon] saying, 'Go. Let's get out of here,' or it was Gailes saying, 'Go, Crazy Cuz [(Taylor)]. You did the Julius thing. Do it. Do it again. We got big money to come here.' " Defense counsel again argued, "We have shown you how it could be, and that's all that needs to be, it could be, [Gailes] telling [Taylor] to go out, not [defendant] telling [Taylor] to go out."

¶ 114                    D. The Verdict and Sentencing

¶ 115          The jury found defendant guilty of first degree murder and attempt (armed robbery).

¶ 116          In August 2022, the trial court conducted defendant's sentencing hearing. The court merged the attempt (armed robbery) conviction into the first degree (felony) murder conviction. After reviewing all of the facts, particularly that (1) defendant was convicted under an accountability theory and (2) the actual shooter, Taylor, received a sentence of 50 years in prison, the court sentenced defendant to 44 years in prison.

¶ 117          This appeal followed.

¶ 118                              II. ANALYSIS

¶ 119          Defendant appeals, arguing that the trial court erred by (1) admitting excessive other-crimes evidence, which the State then used for an improper purpose; (2) admitting certain phone records that were not properly certified as self-authenticating business records; and (3) permitting a detective to offer expert testimony about cell phone location data. Defendant concedes that he did not raise these issues at trial but argues the errors constituted either plain error or ineffective assistance of counsel. We disagree and affirm.

¶ 120          A. Defendant Affirmatively Acquiesced to the Alleged Errors

¶ 121    As an initial matter, defendant and the State disagree whether defendant's failures to object to the complained-of evidence were mere forfeiture or affirmative acquiescence. This is a meaningful distinction because a defendant who forfeits an argument by failing to preserve it in the trial court may still prevail on appeal if he can show plain error. *People v. Bates*, 2018 IL App (4th) 160255, ¶¶ 69-70, 112 N.E.3d 657. However, plain-error review is not available to defendants who acquiesce to the complained-of procedure or error (*id.* ¶ 74), and in this case, defense counsel explicitly told the trial court he had "no objection" when the State sought to introduce the other-crimes and the cell phone evidence.

¶ 122                                    1. *The Law*

¶ 123    In *People v. Aquisto*, 2022 IL App (4th) 200081, ¶¶ 53-54, 205 N.E.3d 812, this court recently concluded that defense counsel waived any objection to the chain of custody "or on any other ground" by responding "[n]o" when the trial court asked if he had any objection to the admission of the bag containing the alleged controlled substance. Quoting a Utah Supreme Court case, this court wrote the following: " 'Affirmative representations that a party has no objection to the proceedings fall within the scope of the invited error doctrine because such representations reassure the trial court and encourage it to proceed without further consideration of the issues.' [Citation.]" *Id.* ¶ 54. See *People v. Stewart*, 2018 IL App (3d) 160205, ¶ 24, 119 N.E.3d 42; *People v. Cox*, 2017 IL App (1st) 151536, ¶ 76, 89 N.E.3d 898; *People v. Caffey*, 205 Ill. 2d 52, 113-14, 792 N.E.2d 1163, 1202 (2001).

¶ 124                                    2. *This Case*

¶ 125    Here, defense counsel's statements and conduct throughout the case, before and during trial, unequivocally demonstrate that counsel affirmatively acquiesced to the admission of the other-crimes evidence and the cell phone evidence.

¶ 126            a. Counsel's Acquiescence to the Other-Crimes Evidence

¶ 127           First, the State's motion to reconsider the trial court's granting of defendant's motion *in limine* clearly demonstrated its intention to introduce other-crimes evidence. The State explained its belief that defendant would admit he was present during the attempted robbery but was not a participant. The State detailed the other attempted robberies committed by the group both before and after the murder and argued that these acts were admissible to prove defendant's knowledge and intent to assist in the attempted robbery and murder with which he was charged. At the hearing on the State's motion, defense counsel stated, "We will not be contesting that motion." The trial court ruled, "That motion to reconsider will be granted without objection. Evidence previously sought to be admitted by the State will be admitted *based upon the positions taken by the parties*." (Emphasis added.) Defense counsel accepted this characterization and did not object at trial.

¶ 128           Second, not only did defense counsel not object at trial, defense counsel also specifically addressed the other-crimes evidence with the trial court when the court *sua sponte* called for a sidebar after the conclusion of Blackmon's testimony. The court expressed its belief that the State was going to seek to introduce further evidence of other crimes and that such evidence would be offered to show intent and knowledge. Defense counsel did not object to the State's evidence. When asked about the court's giving a limiting instruction contemporaneously with any testimony of other crimes, counsel first asked for more time to research the issue, explaining that he was not sure if he wanted it brought to the jury's attention. After further discussion with the court about the committee comments to the pattern jury instruction, the court said it was "now [or] never," and defense counsel replied, "Well, Judge, I had thought about this obviously beforehand. And I don't want it to be brought to the jury's attention by the Court."

¶ 129 The next day, during Gailes's testimony, the trial court again called a sidebar and asked counsel for his position. Defense counsel said that the defense had decided to request the instruction to be read only at the end of trial. The court asked if this decision was a matter of trial strategy, and counsel confirmed that it was. (We commend the trial court for (1) being aware of this important issue and (2) addressing the issue directly with the parties on the record. Thanks to the trial court's cognizance and diligence, this court has been provided with a clear and thorough record that unequivocally demonstrates that defense counsel made a conscious strategic decision to acquiesce in admission of the other-crime evidence.)

¶ 130 b. Counsel's Acquiescence to the Admission of the Cell Phone Records

¶ 131 On numerous occasions prior to trial, the State disclosed that it was seeking to introduce cell phone records as self-authenticating business records and attached the relevant certifications. In particular, the State disclosed that information in January 2022, six months before trial. Each time the State offered phone records into evidence, the trial court directly asked defense counsel if the defense objected. Each time, counsel told the court the defense had no objection. This repeated course of conduct demonstrates that counsel did not forfeit this issue; instead, counsel affirmatively acquiesced to the admission of the phone records by consistently declining to object in response to a direct question by the court.

¶ 132 Defense counsel's failure to object to the phone records was not mere oversight; instead, it was deliberate trial strategy, as shown by his closing argument. Counsel repeatedly told the jury that the location data from the cell phone records was unimportant because (1) the defense readily conceded that defendant was in the minivan the entire time and (2) all of the eyewitnesses' cell phones were also located next to each other throughout the day and night. In addition, counsel stressed that the phone records that were critical for the jury to focus on were the ones from

Gailes's phone, which showed that Gailes was the only one who saw the Snapchat video of Peoples flashing cash. Counsel argued that these phone records, combined with other testimony from the group, showed that Gailes was the true mastermind because he selected the target at Georgetown Apartments.

¶ 133    Because defense counsel's conduct clearly demonstrates counsel's intention that the trial court admit the very evidence defendant now complains of on appeal, we conclude that defendant has waived the issue of that evidence's admissibility. Accordingly, plain-error review is unavailable to defendant, and we address his claims solely under the rubric of ineffective assistance of counsel.

¶ 134             B. Defendant's Ineffective Assistance of Counsel Claims

¶ 135    "To demonstrate ineffective assistance of counsel, a defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90, 162 N.E.3d 223 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "A reasonable probability is a probability which undermines the confidence in the outcome of the trial." *People v. Sturgeon*, 2019 IL App (4th) 170035 ¶ 84, 126 N.E.3d 703. "Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim." *Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland*, 466 U.S. at 697).

¶ 136    Judicial review of counsel's performance is highly deferential. *People v. McGath*, 2017 IL App (4th) 150608, ¶ 38, 83 N.E.3d 671. We use this deferential standard because there "are countless ways to provide effective assistance in any given case. Even the best criminal

defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. A defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327, 948 N.E.2d 542, 547 (2011). Counsel's strategic choices are virtually unchallengeable on appeal. *Id.* at 333. " 'The decision to rely on one theory of defense to the exclusion of other theories of defense is a matter of trial strategy.' " *People v. Hayes*, 2022 IL App (4th) 210409, ¶ 52 (quoting *People v. Clark*, 207 Ill. App. 3d 439, 450, 565 N.E.2d 1373, 1380 (1991)).

¶ 137    In *Hayes*, 2022 IL App (4th) 210409, ¶ 52, this court wrote the following:

"The Illinois Supreme Court wrote, 'We have also made it clear that a reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight.' *People v. Perry*, 224 Ill. 2d 312, 344, 864 N.E.2d 196, 216 (2007). *** ' "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." ' *People v. Peterson*, 2017 IL 120331, ¶ 80, 106 N.E.3d 944 (quoting *Perry*, 224 Ill. 2d at 355-56)."

¶ 138    When a claim of ineffective assistance of counsel is raised for the first time on direct appeal, this court's review is *de novo*. *Sturgeon*, 2019 IL App (4th) 170035, ¶ 85.

¶ 139        C. The Other-Crimes Evidence Was Properly Admitted

¶ 140    Defendant argues defense counsel was ineffective for failing to object to the State's introduction and "excessive" use of other-crimes evidence about the string of attempted robberies the group engaged in before and after the murder. Defendant asserts that if counsel acquiesced to the other-crimes evidence by stating he had no objection to the State's motion to reconsider the

trial court's exclusion of such evidence, then counsel's choice was so deficient that he was no longer functioning as counsel under the sixth amendment because he completely failed to submit the other-crimes evidence to meaningful adversarial testing.

¶ 141 We strongly disagree with defendant's argument and are persuaded by the State that the other-crimes evidence was offered for a proper purpose. The State points out that because defendant was tried on an accountability theory, the State was required to prove that defendant knowingly provided assistance. Accordingly, evidence of other crimes was permissible to show defendant's knowledge and intent.

¶ 142 We conclude that defense counsel did not render ineffective assistance by acquiescing to the other-crimes evidence because that evidence was admissible under the continuing narrative exception (an exception we discuss *infra* ¶¶ 145-148) to show defendant and the group he was part of was engaged in a single course of criminal conduct, culminating in the attempted robbery and murder. We also note that counsel's decision not to object to the other-crimes evidence was clearly shown to be a matter of strategy at trial when counsel repeatedly emphasized the other group members' participation in the string of robberies and argued that their criminal conduct demonstrated their bias and lack of credibility.

¶ 143                                   1. *The Applicable Law*

¶ 144 "[A] defendant's mental state is ordinarily proved circumstantially by inferences reasonably drawn from the evidence. [Citation.] Intent may be inferred from the character of defendant's acts as well as the circumstances surrounding the commission of the offense." (Internal quotation marks omitted.) *People v. Baker*, 2022 IL App (4th) 210713, ¶ 50. "The term 'other-crimes evidence' encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial." *People v. Spyres*, 359 Ill.

App. 3d 1108, 1112, 835 N.E.2d 974, 977 (2005). "Evidence of other crimes is generally inadmissible to show a defendant's propensity to commit the charged criminal conduct." *People v. Watts*, 2022 IL App (4th) 210590, ¶ 39. However, other-crimes evidence may be admissible to show " 'motive, intent, identity, absence of mistake, *modus operandi*, or any other relevant fact other than propensity.' " *Id.* (quoting *People v. Smith*, 2015 IL App (4th) 130205, ¶ 21, 29 N.E.3d 674).

¶ 145          "This court has recognized that other-crimes evidence is admissible if it is part of a continuing narrative of the event that gave rise to the offense." *People v. Johnson*, 368 Ill. App. 3d 1146, 1155, 859 N.E.2d 290, 299 (2006). Other-crimes evidence is also admissible under the continuing narrative exception when offered to explain an aspect of the crime charged or some of the conduct engaged in by the accused that would otherwise be implausible or perhaps even inexplicable. *People v. Carter*, 362 Ill. App. 3d 1180, 1190, 841 N.E.2d 1052, 1060 (2005).

¶ 146                                    2. *This Case*

¶ 147          In this case, the other-crimes evidence was admissible under the continuing narrative exception. The State had to provide context for the otherwise inexplicable act of attempting to rob a particular car in the middle of the night. The jury could have been misled if the State did not explain the events before and after the robbery attempt that resulted in a murder. See *id.* (agreeing with the trial court's finding that "[w]ithout this other-crimes evidence, the fact-finding process would be shortchanged because the jury would be limited to considering 'a sterile environment of what happened within the few hours on the [date in question] when there was a history here that is clearly relevant to a determination of the true facts of what took place' "). "[W]hen facts concerning uncharged criminal conduct are all part of a continuing narrative which concerns the circumstances attending the entire transaction, they do not concern separate, distinct,

and unconnected crimes." (Internal quotation marks omitted.) *Johnson*, 368 Ill. App. 3d at 1155-56. The group's course of conduct throughout the day demonstrated that the shooting was but one aspect of a continuing scheme to rob drug dealers. The group's course of conduct was also relevant to defendant's level of knowledge, participation, or planning in the attempted robbery that led to the shooting.

¶ 148    Significantly, the State never claimed that defendant was the person who actually killed Bennett. Instead, the State claimed that defendant was guilty of the first degree murder of Bennett based upon his accountability for the criminal conduct of the group of which Taylor, the actual shooter, was a participant. The group's engaging in a series of attempted robberies before and after the shooting of Bennett was relevant to establish a common design. *Id.* at 1156. Accordingly, evidence of defendant's actions throughout the day helped establish his knowledge and intent, as well as undermining any notion that he was not involved.

¶ 149    We conclude that the admission of the other-crimes evidence was a matter of sound trial strategy that did not prejudice defendant. Defense counsel chose not to object to the other-crimes evidence because it was crucial to the defense's theory that the State's witnesses were scapegoating defendant to avoid their own liability as accomplices. Throughout the trial and closing argument, defendant maintained that the State had given "sweetheart" cooperation agreements and plea deals to the crucial witnesses in the case. In particular, the State granted immunity to Gailes and Blackmon, who were also participants in the string of armed robberies. By allowing the jury to hear about the events leading up to and after the murder, defense counsel was able to argue (1) Gailes was just as likely to be the mastermind behind the robberies and (2) the State's witnesses were nothing but self-interested criminals scapegoating defendant to save themselves. Counsel could not have made such an argument in a persuasive manner without the

jury's learning of (1) the direness of the witnesses' legal troubles and (2) just how involved Gailes was in picking out the targets.

¶ 150    We agree with the State that the very nature of defense counsel's strategy removed any potential prejudice of the other-crimes evidence. As we explained, counsel provided the jury with strong justification for disbelieving the witnesses, all of whom received favorable treatment by the State, including immunity. Statements of codefendants and accomplices are viewed with suspicion precisely because common sense suggests their testimony will be heavily biased by self-interest. That presumption was arguably much stronger in this case because the State acknowledged in both its opening statement and closing argument that it granted immunity to Blackmon in order to break open a one-year-old murder investigation that was at a dead end.

¶ 151    In our judgment, defense counsel reasonably decided that the other-crimes evidence was potentially defendant's strongest asset even though it also carried potential risk. We conclude that defendant did not suffer any prejudice because counsel's arguments presented an entirely rational explanation to the jury that the other-crimes evidence actually exculpated, rather than incriminated, defendant.

¶ 152    Reviewing courts must be careful not to assess trial strategy through the distorting lens of hindsight (*People v. Ramirez*, 2018 IL App (1st) 152125, ¶ 16, 127 N.E.3d 146) and "should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable" (*Manning*, 241 Ill. 2d at 335). The mere fact that a trial strategy is risky or unconventional does not mean it was unsound or fell below professional norms. See *People v. Palmer*, 162 Ill. 2d 465, 479-480, 643 N.E.2d 797, 803 (1994) ("Errors in judgment or trial strategy do not establish incompetence [citation] 'even if clearly wrong in retrospect.' [Citation.]"). Defense counsel's strategy was potentially compelling, even though the jury ultimately did not

find it convincing.

¶ 153    Accordingly, we conclude that (1) the other-crimes evidence was properly admitted, (2) defense counsel's strategy was reasonable, and (3) defendant was not prejudiced.

¶ 154                    D. The Cell Phone Records

¶ 155    Defendant next argues that defense counsel was ineffective for failing to object to the phone records from AT&T because the accompanying certification did not meet the requirements for self-authentication under Rule 902(11). Defendant asserts that those phone records provided the cell phone location data that the State used to corroborate the witnesses' testimony. Defendant contends that the corroboration was crucial because the witnesses were otherwise not credible, given that (1) they were very intoxicated the entire night, (2) they could not agree on basic facts like who was in the minivan, and (3) the State granted them immunity.

¶ 156    In response, the State contends that defense counsel did not object to the cell phone records and location evidence as a matter of trial strategy. Specifically, the State argues the following:

> "Defense counsel had to make a choice about strategy at trial. Counsel could (1) contest defendant's presence in the van, or (2) acknowledge defendant was in the van but argue that he was largely uninvolved in the attempted robbery, or (3) try to argue a hybrid of those arguments—that defendant was not there, but if he was present, he was not involved in the attempted robbery. Defense counsel chose option (2), which was a completely reasonable trial strategy."

¶ 157    Alternatively, the State contends defendant was not prejudiced by the cell phone evidence because the other evidence of defendant's guilt was overwhelming. The State points out that the eyewitnesses told remarkably consistent stories, both to the police in recorded interviews

from 2017 and at trial. Any inconsistencies, the State insists, were minor and make up a tiny portion of the five-day trial. The State further notes that defendant's actions after the crime, such as hiding the gun, changing his phone number, illegally fleeing to Texas, and calling his sister, unprompted, to discuss the murder and make sure she was not with the victim's family all provide convincing evidence of defendant's guilty conscience.

¶ 158 Defendant rebuts these arguments by asserting that merely because something is trial strategy does not mean that (1) such a strategy is objectively reasonable or (2) defendant was not prejudiced by the strategic decision. Defendant also points out that the State makes no argument that the certifications come close to complying with Rule 902(11) or are otherwise admissible based on information contained in the record. Defendant claims that the location data and maps were crucial because they provided objective corroboration to otherwise inconsistent and suspect testimony from intoxicated codefendants and accomplices. Defendant vehemently disagrees that any discrepancies were minor, pointing out that the witnesses disagreed about critical facts from before, during, and after the shooting such as (1) who was in the minivan, (2) who they allegedly tried to rob, (3) where they went, (4) when they went there, and (5) the order of events. In defendant's view, the evidence was closely balanced.

¶ 159 We agree with the State that (1) defense counsel's strategic choice was reasonable and (2) that choice could not have prejudiced defendant because the evidence of his guilt was overwhelming.

¶ 160                              1. *The Applicable Law*

¶ 161 Counsel's decision of "[w]hether to object to matters such as foundation for evidence is, by and large, a matter of trial strategy." *People v. Probst*, 344 Ill. App. 3d 378, 387, 800 N.E.2d 834, 843 (2003); see *People v. Diaz*, 377 Ill. App. 3d 339, 349-50 (2007) (holding

counsel's failure to object to the lack of foundation for the horizontal gaze nystagmus test was a matter of trial strategy).

¶ 162     When addressing claims of ineffective assistance, courts of review consider "the totality of counsel's conduct." (Internal quotation marks omitted.) *Hayes*, 2022 IL App (4th) 210409, ¶ 65. "We do not have to necessarily agree that it was the best or most persuasive trial strategy as long as we can find it to be 'reasonable trial strategy.' " *People v. Logan*, 2022 IL App (4th) 210492, ¶ 141, 203 N.E.3d 418. " 'A defendant is entitled to competent, not perfect, representation, and mistakes in trial strategy or judgment will not, of themselves, render the representation ineffective.' " *People v. Bell*, 2021 IL App (1st) 190366, ¶ 63, 189 N.E.3d 531 (quoting *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 26, 79 N.E.3d 782). " 'A weak or insufficient defense does not indicate ineffectiveness of counsel in a case where a defendant has no defense.' " *Hayes*, 2022 IL App (4th) 210409, ¶ 64 (quoting *People v. Ganus*, 148 Ill. 2d 466, 474, 594 N.E.2d 211, 215 (1992)). A defense counsel's "thoroughly pursuing the only path available to [a] defendant is not ineffective assistance of counsel." *Id.*

¶ 163                    2. *This Case*

¶ 164                    a. Trial Strategy

¶ 165     In this case, the record demonstrates that by the time of the trial, defendant's trial strategy was largely in place. While representing himself, defendant moved to (1) suppress his statements to the police and (2) dismiss the charges on grounds that investigating officers lied to the grand jury. Both claims were based on his recorded interviews with the police in October 2017. The evidence from those hearings shows that defendant had admitted to the police that he was present in the minivan before, during, and after the shooting of Bennett. However, defendant claimed that (1) he was asleep and not involved and (2) Gailes and Taylor were the ones who

planned and executed the robbery that resulted in the shooting of Bennett. Accordingly, defendant had to concede that he was present in the minivan or he risked being impeached with his own statements.

¶ 166 Although the State did not seek to introduce defendant's statements at trial, the State certainly could have and would have if defendant's strategy even hinted at claiming he was not present. As long as defendant did not contest that he was in the minivan, the State had no incentive to offer defendant's interview, which would have essentially allowed defendant to present his side of the story without being subject to cross-examination.

¶ 167 Defense counsel's strategy was confirmed by his closing argument. Counsel repeatedly told the jury that the location data from the cell phone records was unimportant because (1) counsel readily conceded that defendant was in the minivan the entire time and (2) all of the eyewitnesses' cell phones were also located next to each other throughout the day and night. Not only did counsel concede that defendant was with the group in the minivan the entire night, counsel used the cell phone location data from the other group members to argue that they were just as culpable as defendant but (1) had not been charged with murder or (2) were offered immunity in exchange for their testimony.

¶ 168 In addition, counsel stressed that the phone records that were critical for the jury to focus on were the ones from Gailes's phone, which showed that Gailes was the only one who saw the Snapchat video of Peoples flashing cash. Counsel argued that these phone records, combined with other testimony from the group, showed that Gailes was the true mastermind because he selected the target at Georgetown Apartments. Accordingly, objecting to the cell phone records would have hurt defendant's theory of the case.

¶ 169 b. Lack of Prejudice

¶ 170        In *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 64, 205 N.E.3d 812, this court wrote the following:

> "Let us assume, for the sake of argument, that the omission of a chain-of-custody objection was deficient performance. Even so, to find prejudice from the omission of such an objection, we would have to find a reasonable probability that, if defense counsel had made such a chain-of-custody objection, the State would have been unable to cure the objection (and, consequently, the circuit court would have refused to admit People's exhibit No. 1 and would have acquitted defendant of count IV). In the record before us, we find no basis for asserting a reasonable probability that the State would have been incapable of curing any chain-of-custody objection."

¶ 171        In this case, we are similarly unable to find anything in the record that suggests that if defense counsel had objected to the admission of the records on the basis that they were not properly certified, the State would not have been able to lay the proper foundation, either by obtaining new certifications or calling a witness who could authenticate the records.

¶ 172        Alternatively, defendant cannot demonstrate prejudice because the evidence of his guilt was overwhelming even without considering the cell phone records. This court's decision in *People v. Fox*, 2022 IL App (4th) 210262, 213 N.E.3d 34 is instructive. In *Fox*, the defendant was charged with shooting and killing Demesheo Lovelace. *Id.* ¶ 1. The defendant's girlfriend gave key testimony about the defendant's movements before and after the shooting of Lovelace. *Id.* ¶¶ 36-43. Eyewitnesses identified the defendant as the shooter. *Id.* ¶¶ 22-29. The State corroborated this testimony through extensive expert testimony and cell phone records establishing the defendant's movements matched the witness testimony. *Id.* ¶¶ 49-55.

¶ 173        On appeal, we agreed with the defendant that the trial court erred by admitting cell

phone records into evidence as self-authenticating business records because the accompanying certifications did not allege that they were made under oath. Nonetheless, we concluded that the error was harmless because "[t]he remaining evidence of [the] defendant's guilt [was] overwhelming." *Id.* ¶ 85. In particular, the cell phone evidence merely corroborated evidence the jury already heard through eyewitness testimony. *Id.* ¶ 90.

¶ 174    We reach the same conclusion in this case. Defendant was tried on an accountability theory. Accordingly, the most significant evidence in the case was not where defendant and his accomplices were throughout the day and night; instead, the most significant evidence was the consistency of the accomplices' testimony that it was defendant who orchestrated the armed robbery.

¶ 175    We also note that in the days and weeks after the shooting, defendant engaged in behavior that indicated consciousness of guilt. Defendant traveled to Texas in early January despite being legally prohibited from leaving Illinois. He called his sister to tell her about the move and change in phone number. Unprompted, he then inquired about the shooting, claimed he heard it was an accident, and asked Whiteside if she was staying with anyone in the Bennett family. A month later, defendant returned to Springfield with a train ticket bought by Bolden.

¶ 176    The evidence shows, in Taylor's words, that defendant was the "mastermind" behind the events of the day and the attempted robbery at Georgetown Apartments in particular. The course of conduct by defendant and the others in the group demonstrates that Bennett's murder was committed as one of multiple efforts to rob known drug dealers.

¶ 177    The two most critical witnesses, Taylor and Gailes, had told the police the same or similar information in their 2017 interviews, consistent with their trial testimony. Taylor pleaded guilty to the murder. And although Gailes was granted immunity for his testimony at trial, he

conceded that the State had charged him with the same offenses as defendant and those charges were still pending. Given this context, as well as the consistent witness testimony and corroboration by forensic evidence of the gun, we conclude that the evidence of defendant's guilt was overwhelming and any potential error from the introduction of the cell phone records or location data did not affect his right to a fair trial.

¶ 178                                    E. Expert Testimony

¶ 179        Last, defendant argues that defense counsel was ineffective for failing to object to Zajicek's testifying as an expert witness in cell phone location analysis. Defendant asserts that the State failed to lay a foundation for Zajicek's testimony and never "certified" him as an expert. As an initial matter, we note that this court has held that the party offering the opinion testimony is not required to ask the trial court to "certify" or rule that the witness is a qualified expert in the relevant field. *People v. Pingleton*, 2021 IL App (4th) 180751, ¶¶ 46, 49-63, 177 N.E.3d 1169.

¶ 180        In addition, defendant offers nothing to suggest that either the State (1) did not lay an appropriate foundation for Zajicek to testify as an expert or (2) could not have presented additional testimony to support Zajicek's expertise had defendant objected to his testimony as an expert. Zajicek testified that (1) he had been a police officer for 17 years and a detective since 2015 and (2) he worked with cell phone records as part of his job. Zajicek also testified that he received specialized training, including "advanced training in cell phone analysis and cell phone network analysis." During his testimony, Zajicek thoroughly explained how cell phones worked, how cell phones communicated with towers, and how cell phone tower data was kept by the cell phone service providers. Notably, when defendant raised a speculation objection to the State's asking Zajicek whether the cell phones of two people who were next to each other would use the same tower, the trial court overruled defendant's objection, explaining, "No, I think [Zajicek's]

given enough expertise and enough background to be able to answer that question."

¶ 181　　　　Further, defense counsel's strategy behind acquiescing to the admission of the phone records also applies to Zajicek's testimony about the location data. Not only did counsel concede during closing argument that defendant was with the group in the minivan the entire night, counsel used the cell phone location data from the other group members to argue that they were just as culpable but had not been charged with murder or were offered immunity in exchange for their testimony.

¶ 182　　　　Had defense counsel objected to Zajicek's qualifications, particularly when the trial court had already remarked that Zajicek had expertise in the area, that objection would not only have been fruitless, but it would have drawn out or highlighted Zajicek's testimony for the jury, which defense counsel argued was essentially worthless. Accordingly, we conclude that defense counsel's strategy did not prejudice defendant.

¶ 183　　　　　　　　　　　　　　III. CONCLUSION

¶ 184　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 185　　　　Affirmed.